**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                *Plaintiff-Appellee,*

v.

RACHEL ALAFFA JERNIGAN,
                *Defendant-Appellant.*

No. 05-10086

D.C. No.
CR-00-01010-EHC

OPINION

Appeal from the United States District Court
for the District of Arizona
Earl H. Carroll, District Judge, Presiding

Argued and Submitted
March 22, 2007—San Francisco, California

Filed July 9, 2007

Before: Mary M. Schroeder, Chief Circuit Judge,
Betty B. Fletcher, Harry Pregerson, Alex Kozinski,
Diarmuid F. O'Scannlain, Pamela Ann Rymer,
Barry G. Silverman, M. Margaret McKeown,
Raymond C. Fisher, Ronald M. Gould, Marsha S. Berzon,
Jay S. Bybee, Consuelo M. Callahan, Carlos T. Bea, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge B. Fletcher;
Dissent by Judge Bea

8167

## COUNSEL

Thomas M. Hoidal, Hoidal & Hannah, PLC, Phoenix, Arizona, for the defendant-appellant.

Michael T. Morrissey, Assitant United States Attorney, Phoenix, Arizona, for the plaintiff-appellee.

## OPINION

B. FLETCHER, Circuit Judge:

Defendant Rachel Jernigan was arrested on November 10, 2000, for allegedly robbing three banks. After Jernigan was placed in custody and awaiting trial, two more area banks were robbed by a woman whose description bore an uncanny physical resemblance to hers: both women were roughly five feet tall, Hispanic,[1] and had acne or pock-marked complexions. Although the prosecution knew that other nearby banks had been robbed by a diminutive, Hispanic female with poor skin after Jernigan's arrest, the prosecution failed to relay this information to defense counsel.

---

[1]"Latina" may be the more accurate term but throughout the proceedings "Hispanic" has been used.

Proceeding without knowledge of the second alleged bank robber, Jernigan's counsel argued at trial simply that his client was misidentified. However, the jury was not persuaded, and Jernigan was convicted of bank robbery on March 23, 2001.

While in prison Jernigan learned that a woman fitting a similar description had been arrested for robbing several banks in the area. In January 2004, Jernigan filed a motion for a new trial asserting that (1) the government violated her due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose before trial material, exculpatory evidence known to the government, and alternatively that (2) evidence discovered after trial required that Jernigan receive a new trial pursuant to Federal Rule of Criminal Procedure 33. The district court denied her motion in January 2005, and Jernigan appealed. After a panel of this court affirmed the district court, we voted to rehear this case en banc. We disagree with both the original panel and the district court and hold that the suppressed evidence was material to Jernigan's guilt.[2] The district court's decision is hereby reversed, and we remand for a new trial.

## I.

On September 20, 2000, the Bank of America branch in Gilbert, Arizona was robbed by a short, Hispanic woman with a pock-marked face. The robber posed as a bank customer. When her turn in line came, she passed a sloppy, hand-written note to Elizabeth Chlupsa, the victim bank teller, threatening to shoot if Chlupsa did not hand over all of the money in her drawer. Chlupsa complied with the demand note, and the robber fled without having said a word.

Jernigan became a suspect after a chance conversation

---

[2]We therefore need not reach the question of whether the district court erred in denying Jernigan's motion for a new trial based on Federal Rule of Criminal Procedure 33.

between the FBI agent investigating the bank robbery and a postal inspector who was investigating Jernigan in connection with some shoplifting incidents at a local post office. During their conversation, the postal inspector noted that Jernigan fit the description of the unidentified bank robber. After reviewing photographs of Jernigan and comparing them to surveillance photographs from the September 20th robbery, the FBI agent focused his investigation on Jernigan. The agent created a photographic lineup that included Jernigan and showed the photos to the victim bank teller, who identified Jernigan as the woman who had robbed her. No other eyewitnesses were shown the photospread — or any other photographs of Jernigan — until five or six months later.

Police arrested Jernigan on November 10, 2000, and she has remained in custody since that time. In addition to the September 20, 2000 robbery, police also charged Jernigan with two additional bank robberies: an October 11, 2000 robbery at 906 East Baseline Road in Tempe, and an October 25, 2000 robbery at 2298 North Alma School in Chandler. Following Jernigan's incarceration, but before her trial, two other bank robberies were committed — one on November 28, 2000, and another on November 30, 2000 — by a person matching Jernigan's description: a short, Hispanic woman with acne. One bank was located across the street from one of the banks allegedly robbed by Jernigan; the other bank was located approximately ten miles away.

The district court ultimately severed the charges involving the September 20th robbery from the other robberies with which she was charged. Jernigan's trial for the September 20th robbery began on March 20, 2001. At trial, the government relied entirely on the accounts of five eyewitnesses and the bank surveillance video. The video did not provide a clean look at the bank robber's face[3] and was used primarily to bol-

---

[3]We have reviewed the surveillance video and still images taken from the video and agree that this evidence does not identify Jernigan as the robber. The image is of poor quality and the robber is wearing a hat that obscures her face.

ster the eyewitnesses' testimony. No physical evidence tied Jernigan to the robbery. Jernigan flatly denied involvement in any bank robberies and, at trial, her counsel argued that she had been misidentified by the witnesses. Counsel did not, however, suggest to the jury who might have been the robber if Jernigan were not.

The jury convicted Jernigan of both armed bank robbery and use of a firearm during an armed bank robbery. The district court sentenced her to 168 months in jail and five years of supervised release. The remaining bank robbery charges were dismissed by stipulation.

On December 11, 2001, Juanita Rodriguez-Gallegos robbed the same bank allegedly robbed by Jernigan on September 20, 2000. During that robbery the victim teller, Kathleen Golliher, placed a tracking device in the stolen money. Police stopped Rodriguez-Gallegos half an hour after the robbery and Golliher identified her as the robber.[4] The police report described Rodriguez-Gallegos as a Hispanic female, 4'11" and 125 pounds, with brown eyes, black hair, and pock-marked cheeks. Police charged Rodriguez-Gallegos with the November 28, 2000, November 30, 2000, and December 11, 2001 bank robberies, and with one count of brandishing a firearm during a violent crime. She pled guilty to the firearm offense, and the remaining charges were dropped.

After learning of Rodriguez-Gallegos's arrest from fellow inmates, Jernigan moved for a new trial. In her motion, Jernigan asserted that the government had failed to meet its *Brady* obligations by not disclosing the existence of a phenotypically

---

[4]Golliher asserted during the hearing on the motion for a new trial that the two bank robberies, both of which she witnessed, were conducted by different women. The robberies took place 15 months apart. Golliher was not the victim teller in the September 20, 2000 robbery. Moreover, she was at some distance from the robber and gave conflicting accounts of the woman's complexion and age.

similar bank robber who had been robbing banks in the same area after Jernigan's incarceration. She also argued that the district court should grant her a new trial under Rule 33 based upon the post-conviction developments involving Rodriguez Gallegos. The district court denied the motion on both grounds, and Jernigan appealed.

## II.

**[1]** In *Brady v. Maryland*, the Supreme Court explained, "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." 373 U.S. at 87. The Court also noted that prosecutors are charged not only with winning trials but with seeking justice. *Id.* at 87-88 & n.2. Premised on this understanding of fairness and prosecutorial responsibility, the Court held that the suppression of evidence favorable to any accused violates the due process of law, irrespective of whether the suppression is done in good faith or bad. *Id.* at 87.

**[2]** *Brady*'s progeny have articulated three elements that defendants must prove to show a *Brady* violation. *See Benn v. Lambert*, 283 F.3d 1040, 1052 (9th Cir. 2002). First, the suppressed evidence must be favorable to the accused. *See United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *Brady*, 373 U.S. at 87). Second, the evidence must have been suppressed by the government, either willfully or inadvertently.[5] *See United States v. Agurs*, 427 U.S. 97, 110 (1976). And third, the suppressed evidence must be material to the guilt or innocence of the defendant. *See Bagley*, 473 U.S. at 676-78. Because the government does not dispute that the evidence of an additional bank robber matching Jernigan's description

---

[5]The investigation of all of the robberies was conducted by an FBI agent who apparently never told the prosecutor about the November robberies. There is no indication that anyone in the U.S. Attorney's office acted in bad faith.

was favorable to Jernigan and that the government failed to provide it to defense counsel, the only issue in dispute is whether the evidence was material.

The touchstone of materiality review is whether admission of the suppressed evidence would have created a " 'reasonable probability' of a different result."[6] *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citing *Bagley*, 473 U.S. at 682). And as the *Kyles* Court emphasized, the adjective "reasonable" is important. *Id.* A defendant need not show that she "would more likely than not have received a different verdict with the evidence." *Id.* Instead, she must show only that "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' "[7] *Id.* (quoting *Bagley*, 473 U.S. at 678). In considering whether the failure to disclose exculpatory evidence undermines confidence in the outcome, judges must

---

[6]The dissenting opinion presents a red herring and side steps the issue before the court. At dispute is not whether Jernigan and Rodriguez-Gallegos "look alike." At the time of Jernigan's trial, the government did not know who committed the November robberies. As a result, what Rodriguez-Gallegos actually looks like is completely irrelevant to the *Brady* analysis. The question is whether a reasonable probability existed that the jury would have arrived at a different result if provided with the excluded evidence. More specifically, the question is whether the jury, when presented with nothing more than shaky, cross-racial eyewitness identifications, unsupported by any physical evidence, would have arrived at a different result when informed that a woman described in uncannily similar terms — terms describing a most unlikely bank robber — was robbing banks in the same area just days after Jernigan's incarceration. Given the extraordinary unlikelihood of two such robbers existing at the same time in the same place, the majority believes that the jury may well have accepted Jernigan's "misidentification" defense had the suppressed evidence been admitted.

[7]*Kyles* specifically rejected the idea that *Brady* required a sufficiency of the evidence test. 514 U.S. at 434-35. Defendants may prevail in a *Brady* challenge even if the evidence remains sufficient to convict following the introduction of the suppressed evidence. *Id.* Defendants need only show "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

" 'undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial.' " *Baily v. Rae*, 339 F.3d 1107, 1119 (9th Cir. 2003) (quoting *Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir. 2001)). In other words, "the withheld evidence must be analyzed 'in the context of the entire record.' " *Benn*, 283 F.3d at 1053 (quoting *Agurs*, 427 U.S. at 112).

**[3]** Here, the suppressed evidence substantially erodes the already questionable value of the eyewitness identifications. "Centuries of experience in the administration of criminal justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness is highly suspect. Of all the various kinds of evidence it is the least reliable, especially where unsupported by corroborating evidence." *Jackson v. Fogg*, 589 F.2d 108, 112 (2d Cir. 1978); *see also* Department of Justice, Eyewitness Evidence: A Guide for Law Enforcement 1, 3 (Oct. 1999); Gary L. Wells et al., *Eyewitness Identification Procedures: Recommendations For Lineups and Photospreads*, 22 L. & HUM. BEHAV. 603, 619-27 (1998); Gary L. Wells et al., *Accuracy, Confidence, and Juror Perceptions in Eyewitness Identification*, 64 J. APPLIED PSYCHOL. 440 (1979). Cross-racial identifications, such as the eyewitness accounts offered against Jernigan, are particularly suspect. *See* Harvey Gee, *Eyewitness Testimony and Cross-Racial Identification*, 35 NEW ENG. L. REV. 835 (2001) (reviewing Elizabeth F. Loftus, Eyewitness Testimony (1996)); John P. Rutledge, *They All Look Alike: The Inaccuracy of Cross-Racial Identifications*, 28 AM. J. CRIM. L. 207 (2001). In a case that turned *entirely* on eyewitness identifications, the presence of a second robber in the same area fitting the very same physical description was bound to "substantially reduce[ ] or destroy[ ]" the "value" of the eyewitness testimony. *See Kyles*, 514 U.S. at 441.

**[4]** Five eyewitnesses testified at Jernigan's trial, describing the robber as, *inter alia*, "a very, very short Hispanic, what I

thought was Hispanic-looking lady." "She was very small, either five-foot or under five foot." She was "either Hispanic or Oriental." She was a "[v]ery small person, possibly Hispanic." She was "a short Asian woman." "[S]he may have had acne, kind of pocked." She did not have "a clear complexion." "She had very dark hair, black."

**[5]** The government knew shortly after Jernigan's arrest, but did not disclose, that witnesses to two additional bank robberies, which took place close to the bank she was charged with robbing, offered strikingly similar descriptions of the perpetrator. Witnesses described the November 28th robber as "Hispanic or Oriental" with "[a] little acne," "5′1″-5′2,′″" and "[d]ark brown hair." The November 30th robber was described as "Female," "Hispanic," "5′1″-5′2″," with a "Pot [sic] Marked Face." She was also described as a "small Asian woman under 5 ft." The police bulletin described a Hispanic female, 30s, 5′02″, 130 pounds, black hair, pock marked cheeks and braces."

**[6]** Moreover, the victim tellers reported similar modus operandi in all of the robberies. The victim teller testified that during the September 20th robbery the robber slid her a note that read, "Don't make a big scene, give me all your money, don't give me any dye packs or tracking devices and don't press the alarm or else I will shoot." The note was "handwritten" in a "fairly big and kind of sloppy . . . printed" fashion. On November 30th the robber passed a "note" to the victim teller which said, "in very sloppy writing," "Do not set off alarm, Give me all of your money, Please do not set off your alarm." Similarly, on November 30th, the robber passed a note stating, "Don't turn on any alarms, or you're dead."

**[7]** The uncanny similarity between the descriptions of the alleged robbers would be noteworthy even if the eyewitness accounts did not describe a most unlikely bank robber. In 2000 (the year the robberies in question took place), only six percent of all bank robbery perpetrators were female. Only six

percent of bank robbers overall (male and female) were Hispanic. *See* U.S. Fed. Bureau of Investigation, *Summary and Interpretation of Bank Crime Statistics, 2000* (2002). The likelihood of two short, Hispanic female robbers with pockmarked skin holding up banks in the same area is therefore extremely low.

**[8]** The existence of another bank robber for whom Jernigan may well have been mistaken also magnifies the significance of the gaps and inconsistencies in the prosecution's case. The most obvious gap, as noted earlier, was the complete lack of physical evidence connecting Jernigan to the crime. Even after Jernigan was arrested, the police failed to produce any physical evidence connecting her to the crime: a fingerprint lifted from the victim teller's window did not match Jernigan's print, and, after Jernigan was arrested, the police failed to find the stolen money, the firearm used to conduct the robbery, or any clothing resembling that worn by the robber.

**[9]** Furthermore, the government's witnesses provided inaccurate or inconsistent testimony, which is troubling, but not atypical of eyewitness accounts. For instance, Chlupsa, the victim teller on September 20th, maintained both immediately after the robbery and during trial that the perpetrator had no tattoos and did not have painted fingernails. However, Jernigan has a number of tattoos on her hands and forearms, as evidenced in photographs submitted to the district court and confirmed by the FBI shortly after the arrest.

Chlupsa also described the perpetrator as having plucked eyebrows, wearing "very, very, very, dark eyeliner," "a lot of makeup," and a lot of eyeliner. By contrast, Lorraine Hawley, a customer who stood next to the perpetrator in line, described the robber as wearing "little to no make-up" and no lipstick.[8]

---

[8]Witnesses also had a difficult time determining whether the robber was Asian or Hispanic. Although these inconsistencies may be less significant, they highlight the uncertainty of the eyewitness identifications.

The eyewitnesses' tentativeness is equally telling. Hawley, who claimed to get a good look at the robber, had some trouble picking Jernigan out of a photospread, stating, "I want to say it looks like this one. . . . I would say this would be the one." Golliher appears to have had trouble as well, stating, "By — I just felt that was the one that — that was whom I saw."

These problems are not altogether surprising given that all but one of the eyewitnesses viewed the photospread five to six months after the incident. Hawley first saw the photospread two days before trial — six months after the robbery. Three others — Golliher, employee Yarjanic Nath, and customer Donovan Grierson — were all shown the photos five months after the robbery. This delay, which goes totally unexplained, also detracts from the reliability of the identifications.

**[10]** Finally, the probability that Jernigan was confused with the real bank robber is bolstered further by various pieces of exculpatory evidence.[9] For instance, the getaway car for the October 11, 2000 robbery — a black Toyota 4-Runner — matched the description of the November 30, 2000 getaway car used by Rodriguez-Gallegos. Additionally, the victim teller in the October 11, 2000 robbery could not identify the woman who robbed her from the photospread containing Jernigan; however, the victim declared that the October 11 robber *was* the woman in the surveillance video from the September 20, 2000 robbery, suggesting that the September 20th robber was other than Jernigan — even possibly Rodriguez-Gallegos.

---

[9]Jernigan was questioned by a polygraph expert prior to trial. The polygrapher asked Jernigan about robbing banks both as a general matter and in regard to the three banks for which she was originally arrested. Jernigan denied involvement in those, or any other, bank robberies and her score of 17 indicates a truthful response (anything above a 6 is considered truthful). Jernigan does not challenge the district court's exclusion of this evidence, and we do not consider it in reaching our decision.

**[11]** When considered in isolation, the various gaps, incon-sistencies, and exculpatory details in the record might be insufficient to trump the testimony of the five eyewitnesses. But when this evidence is considered collectively, it under-mines confidence in the outcome of the trial. It may be that two five-foot-tall Hispanic women with pock-marked skin were robbing the same banks in the same area with the same modus operandi and the same getaway vehicles. And it may be that the police just happened to miss finding the gun used in the robbery for which Jernigan was tried, the clothes worn in the robbery, and the money stolen in the robbery, when apprehending Jernigan. But it also may be that the hesitant and conflicting identifications offered by the eyewitnesses many months after the event were incorrect, and that the wit-nesses simply picked Jernigan out of the photospread because she was the woman who looked the most like the real culprit.[10]

**[12]** As we view the withheld evidence in the context of the entire record, it is apparent to us that the evidence was mate-rial and that Jernigan was prejudiced by its suppression. With-holding knowledge of a second suspect conflicts with the Supreme Court's directive that "the criminal trial, as distinct from the prosecutor's private deliberations, [be preserved] as the chosen forum for ascertaining the truth about criminal accusations." *Kyles*, 514 U.S. at 440. By suppressing this evi-dence, the prosecution arrogated to itself a central function belonging to the criminal jury and pursued its role as adver-sary to the exclusion of its role as architect of a just trial. *Cf. Brady*, 373 U.S. at 87-88 & n.2. The government has deprived Jernigan of a fair trial and placed a possibly innocent woman behind bars. Because the evidence withheld by the govern-ment was material, we reverse the decision of the panel and district court, and remand to the district court for further pro-

---

[10]It is worth noting that Rodriguez-Gallegos was never included in any of the photospreads shown to the eyewitnesses. Thus, there was never an opportunity for the witnesses to compare Jernigan and Rodriguez-Gallegos.

ceedings consistent with our opinion.

REVERSED AND REMANDED.

BEA, Circuit Judge, with whom O'SCANNLAIN, Circuit Judge, joins, dissenting:

I cannot articulate my disagreement with the majority's reasoning better than did our colleague Judge Farris: "My brother and I differ on what is the appropriate appellate function. He would retry. I am content to review." *Li v. Ashcroft*, 378 F.3d 959, 964 n.1 (9th Cir. 2004).

The majority gives an exquisitely detailed *tour de force* through the circumstantial evidence of similarity of physical appearance between the two women. That tour certainly allows the preliminary inference that the jury could have found, on that evidence alone, that Rodriguez-Gallegos looked enough like Jernigan; the jury could have found Rodriguez-Gallegos was probably the September 20, 2000 robber on *that* evidence. But our task is not to imagine ourselves as jurors given only the circumstantial evidence of the women's descriptions. We must consider whether the district court erred in rejecting that circumstantial evidence in view of what he saw: that the women did not look alike.[1]

---

[1]The majority concludes that "what Rodriguez-Gallegos actually looks like is completely irrelevant to the *Brady* analysis" because the Government did not know the *identity* of the November 28, 2000 robber prior to Jernigan's trial. *See* note 6, Majority Opinion. The majority errs in failing to distinguish between identity and appearance; they are not synonymous for purposes of determining the materiality of the claimed *Brady* evidence. Although the Government did not know the identity of the November 28, 2000 robber prior to Jernigan's trial, the Government knew what the November 28, 2000 robber looked like prior to Jernigan's trial; the Government possessed and viewed surveillance video of the November 28, 2000 bank robbery prior to Jernigan's trial. FBI Agent Kyle Richard had

When we focus on the proper scope of review, our obligation is solely to determine whether the trial court erred in finding the non-disclosed evidence of the later bank robberies was not material; that no *Brady* violation occurred. *See United States v. Bagley*, 473 U.S. 667, 676-78 (1985) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Determination of the facts upon which *Brady* materiality is decided is properly confided to the trial judge and should be subject to review by us only for clear error. *See* section II.A, *infra*.

The only *Brady* issue[2] before us should be whether Judge Carroll's determination that the women were not of similar appearance was clear error. If not, the undisclosed evidence was not material under *Brady*.

Judge Earl H. Carroll[3] presided over a four-day trial of the bank robbery charge against Jernigan. Jernigan, *sans* the "hat that obscures her face"[4] in the September 20, 2000 bank surveillance video, sat at counsel table, several feet from Judge

---

compared the photographs taken from the November 28, 2000 surveillance video (of Rodriguez-Gallegos) to those of Jernigan, and had determined—as Judge Carroll later did—he was dealing with two different female bank robbers. Significantly, Judge Carroll's determination that Jernigan did not look like the November 28, 2000 robber was based solely on evidence possessed by the government prior to Jernigan's trial, *i.e.*, a photograph taken from the November 28, 2000 surveillance video. *See* Mot. New Trial Tr. 87, May 12, 2004 (Docket No. 117). Accordingly, Judge Carroll's finding that Jernigan did not look like the November 28, 2000 robber is hardly irrelevant. Indeed, if by some happenstance the two women had the same names—further complicating matters from an identity point of view—this coincidence would not have made the evidence "material" under *Brady* for the simple reason the two women do not look alike. Hence, the non-disclosed evidence does not permit the inference that the eyewitnesses mistook Jernigan for Rodriguez-Gallegos.

[2]The Government concedes the evidence was favorable and undisclosed.

[3]Appointed to the district court in 1980.

[4]*See* note 3, Majority Opinion.

Carroll. After about 25 hours of such proximity and on the motion for new trial, Judge Carroll compared a photograph of Rodriguez-Gallegos taken from the November 28, 2000 bank surveillance video with a photograph of Jernigan and with Jernigan herself. The clear photograph of Rodriguez-Gallegos was a full face black and white; she was not wearing a hat of any sort nor, Heaven forfend, a mask. But that was not all Judge Carroll had to help him determine whether there was any chance Jernigan could be mistaken for Rodriguez-Gallegos. No, he also had the written admission of Jernigan's counsel that Jernigan had never argued the two women "looked alike."[5]

Judge Carroll found Jernigan's *Brady* claim meritless and delivered a written decision denying Jernigan's motion for new trial, in which decision he made specific findings regarding whether Jernigan looked enough like Rodriguez-Gallegos, so that the former could be mistaken for the latter:

> "The simple fact is that [Jernigan] and Rodriguez[-Gallegos] do not look alike . . . ."

> "The defense has not argued the two women 'look alike.' "

> "Common sense says that if Defendant and Rodriguez do not look alike, the fact that they may share similar physical characteristics such as height, racial characteristics and poor complexions, does not support a finding or an 'inference' that Rodriguez-Gallegos robbed the Bank of America branch in Gilbert on September 20, 2000."[6]

Judge Carroll's written decision is consistent with his earlier finding that Jernigan's "appearance, physical appearance,

---

[5]Def.'s Reply on Mot. for New Trial 4, April 12, 2004.
[6]Order, January 21, 2005.

her face, mouth, hair and that of this Miss Rodriguez[-Gallegos] . . . are markedly different."[7]

The majority labels Judge Carroll's finding of dissimilarity a "red herring." *See* note 6, Majority Opinion. Is the finding that Jernigan and Rodriguez-Gallegos do not look alike really a "deliberately misleading object," like the smoked and smelly fish that poachers would trail on the ground, away from their game, to throw the owner's dogs off, and leave the game to the poachers?

No, to call Judge Carroll's visual determination the women did not look alike a "red herring" is to invoke the last retort of the knave caught red-handed: "Who are you going to believe, me or your lying eyes?"

Unlike the majority, I cannot ignore Judge Carroll's eyes and their finding; they determine the undisclosed circumstantial evidence was not material.

Let me illustrate the effect of such a finding. Assume the prosecutor had disclosed the circumstantial description evidence which suggested Jernigan looked like the November 28, 2000 robber, later identified as Rodriguez-Gallegos. But also assume the prosecutor had disclosed evidence that convinced Judge Carroll that Rodriguez-Gallegos was in fact incarcerated throughout the day of September 20, 2000, and thus unable to have committed the September 20, 2000 bank robbery. Exercising his gate-keeping function to bar confusing and misleading testimony, Judge Carroll would exclude the circumstantial description testimony as irrelevant. *See* Fed. R. Evid. 104, 402 and 403. We would affirm. We would also affirm if the evidence had not been disclosed at all, *see United States v. Sarno*, 73 F.3d 1470, 1506 (9th Cir. 1995), unless Judge Carroll had committed reversible error in his evidentiary ruling that Rodriguez-Gallegos was in jail and

---

[7]Mot. New Trial Tr. 87, May 12, 2004 (Docket No. 117).

thus unable to have committed the September 20, 2000 bank robbery.

Here, the November 28, 2000 surveillance video photograph dictates the same conclusion because it supports Judge Carroll's finding that Jernigan and the November 28, 2000 robber, Rodriguez-Gallegos, do not look alike. Judge Carroll's ruling was that even if disclosed, evidence of "the robberies in November 2000 *would not have been admissible in this case*[.]" *See* Order at 7, January 21, 2005 (emphasis added). In short, the fact that Jernigan and the November 28, 2000 robber do not look alike, far from being a "red herring," is the central judicial ruling which renders the undisclosed evidence irrelevant, hence not "material"—unless the Judge who so ruled committed reversible error in his ruling. That is the only issue properly before us.

Applying the correct scope of review, Judge Carroll's factual findings—carefully ignored by the majority—are not clearly erroneous[8] and, in my view, are entitled to deference. Accordingly, since the claimed *Brady* evidence would not have undermined confidence in the jury verdict of conviction, I would affirm.

The majority, however, refuses to accord deference to these findings, departs from binding Supreme Court precedent in that regard,[9] engages in appellate fact finding without the benefit of ever having seen Jernigan (except in the video where she wore a face obscuring hat), departs from *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), by not determining materiality on the basis of *all* the non-disclosed evidence, and reverses.

---

[8]There is no claim that Judge Carroll did not actually have a photograph of Rodriguez-Gallegos to compare to Jernigan or that Judge Carroll was indeed blind—claims that might be grounds for clear error in fact finding.

[9]Similar appellate fact finding contrary to what the trial judge has observed and has deduced from his own observations have recently resulted in reversals of our decisions. *See Uttecht v. Brown*, 127 S. Ct. 2218 (2007); *Collins v. Rice*, 546 U.S. 333 (2006).

## I.

On November 10, 2000, Jernigan was arrested on suspicion of robbing three banks in the East Valley area of Arizona: one on September 20, 2000, one on October 11, 2000, and one on October 25, 2000. While Jernigan was in custody pending trial, two additional banks were robbed in the East Valley: one on November 28, 2000 and one on November 30, 2000. Witness statements from all five bank robberies describe the robber as a short Hispanic woman with a poor complexion.

Agent Kyle Richard, the bank robbery coordinator at the Federal Bureau of Investigation's Phoenix division, was the case agent for all five bank robberies. Agent Richard determined the bank robberies in September and October were not committed by the same woman who committed the bank robberies in November. This determination was based on comparisons of the modus operandi, witness statements, and a photograph of Jernigan with photographs taken from the surveillance video of the November robberies. Owing to his determination, Agent Richard did not inform the Assistant United States Attorney prosecuting Jernigan's case of the November robberies.[10] Thus, the Assistant United States Attorney did not disclose the November bank robberies to Jernigan's defense counsel.

Five eyewitnesses independently identified Jernigan as having committed the September 20, 2000 bank robbery. At Jernigan's trial, two of the eyewitnesses described close range contacts with Jernigan. One, the victim teller, who was in the immediate presence of Jernigan at the time of the robbery for several minutes, described Jernigan accurately thereafter, and

---

[10]This in no way alleviated the Assistant United States Attorney's duty to disclose the November robberies if they were material under *Brady*. *See Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

had no trouble identifying Jernigan when she picked her out from the photospread two days after the robbery.[11] The other testified Jernigan resembled a friend, which made identification for her much easier. The testimony of these two eyewitnesses was corroborated by the testimony of three additional eyewitnesses and the bank surveillance video. As the majority notes, the surveillance video from the September 20, 2000 bank robbery suffers from a lack of quality and was used primarily to bolster the eyewitnesses' testimony.

Jernigan's trial defense counsel argued mistaken identify to no avail, and Jernigan was convicted of the September 20, 2000 bank robbery.

On December 11, 2001, Rodriguez-Gallegos was arrested shortly after robbing the same bank Jernigan was convicted of robbing on September 20, 2000. In addition to the December 11, 2001 bank robbery, Rodriguez-Gallegos was charged with the November 28, 2000 and November 30, 2000 bank robberies.

After learning of Rodriguez-Gallegos' arrest, Jernigan filed a motion for a new trial, asserting a *Brady* violation on the basis the Government should have disclosed the November 28, 2000 and November 30, 2000 bank robberies. Judge Earl H. Carroll, the same judge who had presided over Jernigan's four-day trial, presided over Jernigan's motion for a new trial. During the evidentiary hearing, Judge Carroll found:

> [W]ith respect at least to *my observation of the defendant in this case*, Miss Jernigan, and the photograph, which is all I have, of the — Miss Rodriguez[-Gallegos], I would observe from what I see there that *they are different people*, and that someone having looked at them under these circum-

---

[11]No claim is made that the photospread was suggestive or otherwise improper.

stances would have been able to make such a determination, if they had been presented with it at the same time or close to that time.

The photograph of Miss Jernigan that was used on the photospread and *her appearance, physical appearance, her face, mouth, hair and that of this Miss Rodriguez[-Gallegos] I think are markedly different*.

Mot. New Trial Tr. 87, May 12, 2004 (Docket No. 117) (emphasis added).

The photograph of Rodriguez-Gallegos to which Judge Carrol compared Jernigan was taken from the surveillance video of the November 28, 2000 bank robbery. This photograph, unlike the surveillance video of the September 20, 2000 bank robbery, does not suffer from a lack of quality. Indeed, this photograph clearly portrays a woman bearing little resemblance to Jernigan. *Compare* PE 15, *with* PE 2, *and* PE 3.

Judge Carroll denied Jernigan's motion for a new trial in a written order stating:

*The simple fact is that [Jernigan] and Rodriguez[-Gallegos] do not look alike*, whatever similarities may be in their complexions or Hispanic appearance. It is at best an oxymoron for the defense to claim that Rodriguez[-Gallegos] is "probably" the September 20, 2000 robber, given the admission "that the two women do not " 'look alike' ";

The Government's arguments about the differences in appearance between Jernigan and Rodriguez-Gallegos are equally thin. In the first place, the Government's repeated insistence that 'Jernigan and Rodriguez[-

> Gallegos] do not in fact look alike,' e.g.
> Response at 9, 11, is a straw man. *The
> defense has not argued the two women
> 'look alike.'* (Defendant's Reply Memoran-
> dum, p.4, Dkt. 104).

> Common sense says that if Defendant and Rodri-
> guez do not look alike, the fact that they may share
> similar physical characteristics such as height, racial
> characteristics and poor complexions, does not sup-
> port a finding or an "inference" that Rodriguez-
> Gallegos robbed the Bank of America branch in Gil-
> bert on September 20, 2000.

Order, January 21, 2005 (emphasis added).

If it is an "oxymoron" for the defense to claim Rodriguez-Gallegos committed the earlier bank robberies, all the while admitting Rodriguez-Gallegos does not look like Jernigan, where does it leave the majority here? It leaves them with the necessity to make appellate findings of fact directly contrary to those made by Judge Carroll and conceded by the defense.

Consider, slowly, the import of such a view. All the appearance characteristics of the two women contained in the witness descriptions are trotted out as *circumstantial evidence* to show the *Brady* materiality of the November bank robberies. These appearance characteristics are relevant to prove one point and one point only: the two women look so much alike that the jury should have been informed of the November robberies because the jury could find that five eyewitnesses mistook Jernigan for Rodriguez-Gallegos, who actually committed the earlier heists. But the importance—the "materiality"—of this circumstantial evidence is abandoned by Jernigan's own counsel's *admission* that even he does not think the woman in the September 20, 2000 bank surveillance

video and Rodriguez-Gallegos look alike, and he affirmatively points out that he does not even argue that point.[12]

Not to worry. The majority's interpretation of *Brady* is that to be material under *Brady*, evidence must merely be *distracting*, when considered alone. Perhaps the majority's idea is based on a notion that accuracy and truth are irrelevant considerations in determining what arms should be given the defendant to make the trial more of an even joust. That may not be an uncommon notion in certain circles, but it has no support in the law, as is obvious from the lack of any citation to buttress this view.

## II.

### A.

The majority and I part company over the applicable standard of review. The majority affords the district court's factual findings no deference. The majority follows our precedent as to legal issues involving *Brady* materiality; such issues of law are to be reviewed *de novo. See United States v. Lehman*, 792 F.2d 899, 901 (9th Cir. 1986) ("We review these questions of law *de novo* and may affirm the district court on any ground supported by the record." (citations omitted)). But, we have not had the opportunity to consider what, if any, deference should be afforded to a district court's factual findings that bear on *Brady* materiality. This case presents the now squandered opportunity to do just that, and to adopt the proper standard of review.

---

[12]Indeed, on motion for new trial Jernigan's defense counsel argued that the September 2000 videotape was of such poor quality that one could not rule out that it showed Rodriguez-Gallegos. This is a particularly weak argument. If the September 2000 tape is undecipherable, it identifies no one, rather than "possibly" someone. It no more identifies Rodriguez-Gallegos than Paris Hilton.

Those of our sister circuits which have considered this question in connection with *Brady* rulings afford deference to the district court's findings of fact. The First, Second, Third, Fifth, Seventh, Eighth, Tenth, and Eleventh Circuits and the United States Court of Appeals for the District of Columbia all afford some level of deference to a district court's factual findings bearing on *Brady* materiality.[13]

---

[13]*See United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) ("Materiality in this context presents us with a mixed question of law and fact. While the trial judge's factual conclusions as to the effect of nondisclosure are entitled to great weight, we examine the record *de novo* to determine whether the evidence in question is material as a matter of law."); *United States v. Vallejo*, 297 F.3d 1154, 1163 (11th Cir. 2002) ("Similarly, a district court's denial of a motion for new trial based on a *Brady* violation is reviewed for abuse of discretion."); *United States v. Ryan*, 153 F.3d 708, 711 (8th Cir. 1998) ("[Abuse of discretion] standard also applies where, as here, a defendant seeks a new trial premised upon a *Brady* claim. This deferential standard of review is especially appropriate in the context of a lengthy, hard-fought, highly charged case like the present one." (citing *United States v. Williams,* 81 F.3d 1434, 1437 (7th Cir. 1996) (citations omitted)); *United States v. Boyd*, 55 F.3d 239, 242 (7th Cir. 1995) ("But the other judgments that the district judge makes, signally here the judgment whether some piece (or pieces) of evidence wrongfully withheld by the government might if disclosed have changed the outcome of the trial, are to be reviewed deferentially. This is not only the rule; it is the dictate of common sense, especially in a case such as this. Forget the 29 witnesses at the evidentiary hearing; forget there *was* an evidentiary hearing on the motion for a new trial. Before then, during the trial, Judge Aspen had for months on end listened to witnesses—had heard, had not merely read, their testimony, and had watched them as they gave it. And he had observed the jurors as they listened to the witnesses. A trial judge of long experience, he would have developed a feel for the impact of the witnesses on the jury—and how that impact might have been different had the government played by the rules—that an appellate court, confined to reading the transcript, cannot duplicate. Judge Aspen may have been mistaken; we might suspect that he *was* mistaken; but unless we are *convinced* that he was mistaken, we have no warrant to reverse. That is what it means to say that appellate review is deferential. It is not abject, but it is deferential." (citations omitted)); *United States v. Thornton*, 1 F.3d 149, 158 (3rd Cir. 1993) ("In considering a district court's ruling on a motion for a new trial based on the failure to disclose *Brady* materials, we will conduct a de novo review of the district court's conclusions of law

As the United States Court of Appeals for the District of Columbia has explained:

> Generally, this court reviews the district court's grant of a new trial for abuse of discretion. However, when confronted with a "purely legal question," our review is de novo. *Brady* claims present something of a special situation. *Thus, as to findings of fact made by the district court, including determinations of credibility made both at trial and in post-trial proceedings, this court would defer under an abuse of discretion standard.* But once the existence and content of undisclosed evidence has been established, the assessment of the materiality of this evidence under *Brady* is a question of law. In this inquiry, the question of prejudice is folded into the determination of whether a violation has occurred. As the Supreme Court has explained, "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Therefore, once a

---

as well as a 'clearly erroneous' review of any findings of fact where appropriate. Where the district court applies the correct legal standard, its weighing of the evidence merits deference from the Court of Appeals, especially given the difficulty inherent in measuring the effect of a non-disclosure on the course of a lengthy trial covering many witnesses and exhibits." (internal quotation marks and citations omitted)); *United States v. Sanchez*, 917 F.2d 607, 618 (1st Cir. 1990) ("Due to its inherently fact-bound nature the district court's determination on the materiality of newly discovered evidence in prosecutorial nondisclosure cases is ordinarily accorded deference."); *United States v. Buchanan*, 891 F.2d 1436, 1440 (10th Cir. 1989) ("We review the factual findings of a district court acting pursuant to 28 U.S.C. § 2255 under the clearly erroneous standard. However, the materiality of withheld evidence under *Brady* and its possible effect on the verdict are mixed questions of fact and law reviewed *de novo*." (citations omitted)).

court finds a *Brady* violation, a new trial follows as the prescribed remedy, not as a matter of discretion.

*United States v. Oruche*, 484 F.3d 590, 595-96 (D.C. Cir. 2007) (citations omitted) (emphasis added).

Likewise, the Fifth Circuit has explained:

The confusion stems in part from the mixed nature of the *Brady* inquiry. Whereas we typically analyze legal issues *de novo,* a *Brady* determination is inevitably a contextual inquiry, involving questions of both law *and* fact. Moreover, it is intimately intertwined with the trial proceedings: because the court must judge the effect of the evidence on the jury's verdict, the *Brady* decision can never be divorced from the narrative of the trial. In addition, the court must consider not simply the withheld evidence in isolation, but also the quantity and quality of other evidence in the record.

In comparison to a district court ruling on a motion for new trial, an appellate court reviewing a *Brady* violation is at an inherent disadvantage. Gauging the effect that undisclosed evidence might have had on the outcome of the trial is difficult in any event, but it is made more so when it must be based on a cold record. The district judge, by contrast, has at least had the opportunity to hear the testimony at trial firsthand, view the demeanor of the witnesses, observe the ebb and flow of the evidence at trial, and evaluate the strengths and weaknesses of the government's case. When, as here, the balance of evidence presented is close, the outcome of the case will often hinge on a subjective and personal evaluation of the evidence and the witnesses. In such a context, some degree of appellate deference makes sense.

We think there is a reconciling theme in our facially competing approaches to *Brady*—based new trial questions—adhering to decisions that examine the *Brady* question anew, while acknowledging that we must proceed with deference to the factual findings underlying the district court's decision. This gives play to the trial court's superior understanding of the trial, evidence, and witnesses, while reviewing the ultimate constitutional question afresh. It also recognizes that in the new trial context concerns respecting finality are less strong.

*United States v. Sipe*, 388 F.3d 471, 479 (5th Cir. 2004).

I would adopt the standard of review applied by our sister circuits. Specifically, I would defer to the district court's factual findings unless clearly erroneous, "[b]ut once the existence and content of undisclosed evidence has been established, [treat] the assessment of the materiality of this evidence under *Brady* [as] a question of law." *Oruche*, 484 F.3d at 595. Here, there is no basis for concluding Judge Carroll was "clearly erroneous" in his finding that Jernigan's appearance is markedly different from that of Rodriguez-Gallegos. Indeed, the majority does not even suggest a basis for finding such error. Accordingly, as discussed below, there is no basis for finding the non-disclosure of the November bank robberies was "material" under *Brady*.

**B.**

The majority and I also part company over the majority's willingness to depart from precedent requiring *Brady* materiality to be determined on the cumulative effect of the non-disclosed evidence. The majority considers the undisclosed witness descriptions from the November robberies in isolation and concludes a *Brady* violation occurred. The question before us, however, is whether the cumulative effect of the undisclosed evidence—including the November 28, 2000 sur-

veillance video and photographs derived therefrom—was a reasonable probability of a different result.

"[T]he state's obligation under *Brady v. Maryland* to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the government." *Kyles*, 514 U.S. at 421 (citation omitted). Thus, although the tendency and force of undisclosed evidence must be evaluated "item by item; there is no other way," the materiality of such evidence is a separate determination, based on the effect of all the evidence, disclosed and undisclosed. *Id.* at 436 n.10. Accordingly, the majority is correct in explaining that when considering whether non-disclosed evidence would have created a reasonable probability of a different result, judges must " 'undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial.' " *Baily v. Rae*, 339 F.3d 1107, 1119 (9th Cir. 2003) (quoting *Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir. 2001)).

The majority, however, fails to conduct a balanced evaluation of the non-disclosed evidence in this case. Specifically, in determining *Brady* materiality the majority considers only the undisclosed circumstantial evidence that suggests Jernigan and Rodriguez-Gallegos are of similar appearance, *i.e.*, the witness descriptions. The majority fails to consider the direct evidence establishing that Jernigan and Rodriguez-Gallegos are "markedly different" in appearance, *i.e.*, the November 28, 2000 surveillance video, the photograph of Jernigan, and Jernigan herself. The majority's failure to consider the last item comes as no surprise because, unlike Judge Carroll, the majority has never had the benefit of seeing Jernigan in person.

Freed from *Kyles*' requirement that the non-disclosed evidence be evaluated "item by item" and that materiality be determined based on the cumulative effect of *all* the evidence, the majority rests its materiality determination on a finding

that the November robberies were committed by a woman "whose description bore an uncanny physical resemblance" to Jernigan. Having thus erred, the majority speculates the five eyewitnesses who independently identified Jernigan as committing the September 20, 2000 bank robbery "simply picked Jernigan out of the photospread because she was the woman who looked the most like [Rodriguez-Gallegos]."

## III.

As the majority explains, the touchstone of *Brady* materiality is whether admission of the suppressed evidence would have created a " 'reasonable probability' of a different result." *Kyles*, 514 U.S. at 434. "[T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely *net effect* of all such evidence and make disclosure when the point of 'reasonable probability' is reached." *Id.* at 437 (emphasis added). Here, the point of "reasonable probability" was never reached.

The non-disclosed evidence in this case does not create a reasonable probability of a different result because it does not support the inference that the five eyewitness who independently identified Jernigan as having committed the September 20, 2000 bank robbery were mistaken. To do so, the non-disclosed evidence would have to permit the inference that Jernigan sufficiently resembles Rodriguez-Gallegos such that Jernigan could be mistaken for Rodriguez-Gallegos.

Notwithstanding the witness statements, the district court found the non-disclosed photographs taken from the surveillance video of the November 28, 2000 bank robbery establish that Jernigan and Rodriguez-Gallegos are "markedly different" in appearance and "do not look alike, whatever similarities may be in their complexions or Hispanic appearance." In addition, the district court found "someone having looked at them under these circumstances would have been able to make such a determination." These findings are not clearly

erroneous. Moreover, Judge Carroll, who had the benefit of observing Jernigan during the course of her four-day trial, was in a better position than this court to determine whether Jernigan resembles Rodriguez-Gallegos.

In short, I would defer to Judge Carroll's factual findings, conduct a *de novo* review of *Brady* materiality based on Judge Carroll's findings, and affirm.