Jose BELTRAN, Petitioner,

v.

**D. DEXTER, Warden, et al., Respondents.**

No. CV 07–6614–R(RC).

United States District Court, C.D. California.

July 17, 2008.

Jose Beltran, Blythe, CA, pro se.

Lawrence M. Daniels, Margaret E. Maxwell, Office of Attorney General, Los Angeles, CA, for Respondents.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

MANUEL L. REAL, District Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition and other papers along with the attached Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, and has made a *de novo* determination.

IT IS ORDERED that (1) the Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judgment shall be entered denying petitioner's right to file a second or successive petition,

or alternatively, denying the petition and dismissing the action with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation and Judgment by the United States mail on petitioner.

## REPORT AND RECOMMENDATION OF A UNITED STATES MAGISTRATE JUDGE

ROSALYN M. CHAPMAN, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Manuel L. Real, United States District Judge, by Magistrate Judge Rosalyn M. Chapman, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California.

### BACKGROUND

#### I

On January 28, 2000, in Los Angeles County Superior Court case no. KA044980, a jury found petitioner Jose Beltran guilty of one count of conspiracy to commit kidnapping for ransom in violation of California Penal Code ("P.C.") § 182(a)(1) (count 1), three counts of kidnapping for ransom in violation of P.C. § 209(a) (counts 2–4), and one count of grand theft by larceny in violation of P.C. § 487 (count 5), and as to counts 1 through 4, the jury found it not to be true that a principal was armed with a firearm in violation of P.C. § 12022(a)(1).[1] On March 15, 2000, petitioner was sen-

tenced to three consecutive terms of life with the possibility of parole.

Petitioner appealed his convictions to the California Court of Appeal, which affirmed the judgment in an unpublished opinion filed June 14, 2001. Petitioner then sought review in the California Supreme Court, which denied review on August 22, 2001.

On July 14, 2004, petitioner filed a habeas corpus petition in the California Supreme Court, which denied the petition on November 17, 2004. Lodgment nos. 10–11.

On December 8, 2004, petitioner filed a habeas corpus petition in the Los Angeles County Superior Court, which consolidated his petition with habeas corpus petitions from Arnaldo Cosio and Francisco Fonseca,[2] held an evidentiary hearing, and denied petitioner's habeas petition on June 14, 2005. Lodgment nos. 12–15. On September 1, 2005, petitioner filed a habeas corpus petition in the California Court of Appeal, which denied the petition on February 9, 2006. Lodgment nos. 16–17. Finally, on March 23, 2006, petitioner filed a second habeas corpus petition in the California Supreme Court, which denied the petition on November 29, 2006, with citation to *In re Miller*, 17 Cal.2d 734, 112 P.2d 10 (1941).

#### II

The California Court of Appeal, in affirming petitioner's convictions, made the following findings of fact:[3] In June 1999, 22–year–old Janet[4] Renteria, 16–year–old

---

1. Most of the findings of fact set forth in Parts I and II were made by this Court in petitioner's first federal habeas corpus proceeding, *Beltran v. Roe*, case no. 02–4375–R(RC) ("*Beltran I*"), which the Court takes judicial notice of pursuant to Fed.R.Evid. 201.

2. Petitioner was tried with co-defendants Cosio and Jose Fonseca, and defendant Francis-

co Fonseca was tried separately and convicted of one count of conspiracy to commit kidnapping for ransom and three counts of kidnapping for ransom.

3. Lodgment no. 6 at 2–6.

4. Janet Renteria's name is variously spelled as Janet or Janeth throughout the record.

Judith Renteria and 19–year–old Alexander Salcedo ("the cousins") went to Mexicali, Mexico. From there, they were smuggled into the United States by "Chino" and "Moreno." Janet believed that the smugglers would be paid by her aunt and uncle in the United States. Judith realized that they would stay with the smugglers until the smugglers were paid.

Chino and Moreno transported the cousins to Calexico. From there, Moreno and another man, "Chocho," [5] drove the cousins and four other people to a house in El Monte. When the cousins arrived at the house in El Monte, they met petitioner, known to them as "Pepe." Janet told him that her aunt would pay for the smuggling trip, and petitioner was given her telephone number.

On June 11, 1999, Joel Salcedo received a telephone call from a man who identified himself as "Pepe." The man said he had Joel's nephew and two nieces and demanded $1,200 for each of them.

During the next three days, Joel and his sister Lorena raised money to pay for the release of Janet, Judith and Alexander. Joel spoke with Pepe five or six times.

During this time, the cousins were in the house in El Monte. Petitioner, Cosio and Jose Fonseca were at the house for a large part of each of the three days. The cousins were kept in a room of the house. They could leave the room to go to the bathroom or to cook in the kitchen. Cosio stayed in the living room and watched them. Petitioner also stayed in the living room. Petitioner told Janet that they could not go outside.

On the second day of the cousins' stay in the house, Chocho told all three cousins that if the money for their passage was not paid, they would be taken into the desert and killed. Petitioner and Cosio both told Judith the same thing. Janet and Alexander were present when Cosio made his threat.

On June 14, Joel called Pepe and said that he had the money. Pepe told Joel to drive to a 7–Eleven store in El Monte. Joel and Lorena did so. They called Pepe when they arrived. Pepe told them that he would be there shortly.

At the house, the cousins were separated and put into two cars. Janet was put in the back seat of a four-door passenger car. Cosio sat next to her. Judith and Alexander were put in a van driven by petitioner. Fonseca was also in the van. Janet thought they were going to be released.

About 15 minutes after calling Pepe, Joel saw two vehicles pull into the parking lot. He saw Janet in one vehicle and Judith and Alexander in the other. Joel and Lorena approached the passenger side of the first vehicle and gave the money to the man seated in the front passenger seat. The passenger yelled out that not all the money had been provided. One of the men yelled that Joel's and Lorena's nephew and nieces would be killed. The cars drove off. Lorena called the police.

The car and the van returned to the house. Janet asked why they were not being released, and was told that the men had not gotten all the money. One of the men said that she would have to sleep with him. Janet did not try to escape because she was afraid.

About 20 minutes after returning to the house, the cousins were driven to an apartment building in Los Angeles in separate vehicles. Judith did not try to escape because Alexander was in another car. At the building, they were taken to an apart-

---

**5.** Chocho's true name is Francisco Fonseca. He was tried separately from petitioner and Cosio.

ment where petitioner lived with his wife. Petitioner, his wife, and Cosio stayed in the apartment all night. The cousins were confined to the living room and had to ask permission to use the bathroom. Cosio watched them all night. The next day, Cosio took the cousins to another apartment in the building. There were 10 to 20 other people in the apartment. Cosio watched them.

During this time, the El Monte Police had been investigating the situation. Pretending to be a relative of Joel and the cousins, Officer Rafael Batres called the cell phone number given to Joel by Pepe and spoke with a man who identified himself as Pepe. Officer Batres later spoke with petitioner in person, and identified Pepe's voice as belonging to petitioner.

Officers also determined that one of the other telephone numbers given to Joel belonged to a residence at 2152 Mountainview. They observed the house. Shortly after 1:30 p.m. on June 15, police observed one man come out of the house and drive away in a Ford. A few minutes after that, two men left the house and drove away in a Mercury. Officers entered the house but no one was inside.

Other officers followed, then stopped the Mercury. Jose Fonseca and Chocho Fonseca were in the car. Additional officers followed, then stopped the Ford. Petitioner was in that car. Petitioner had a cell phone in his possession. The number of that phone matched one of the numbers given to Joel. Petitioner eventually gave police the address of an apartment in Los Angeles.

Police went to the Los Angeles apartment identified by petitioner, at 1010 35th Street. They found 16 people in the apartment, including the cousins and Cosio.

At trial, petitioner testified that he lived with his wife in an apartment building at 1010 East 35th Street. His friend Francisco Marquez offered to pay him to stay in the house on Mountainview and to feed some people who were arriving from Mexico illegally. He was at the house when the cousins arrived. He called their aunt at their request. On Sunday, petitioner called Cosio and asked him to come over and keep him company. Cosio had no responsibilities in the smuggling. He stayed overnight at the house because he did not have a ride home. Petitioner drove the van to the 7–Eleven. The two people in charge of making the telephone calls were in the car. Petitioner did not know their names. Back at the house in El Monte, the men said that the proffered money was counterfeit. Petitioner denied saying that the cousins would be killed if the money wasn't paid. If anyone had asked to leave the house, he would have let them.

Cosio testified that on Sunday, petitioner called and invited him to a house in El Monte. When Cosio got there, petitioner told him that he was feeding the people in the house. Petitioner did not ask him for help. Cosio spent the night because he did not have a ride back to Los Angeles. The next morning Cosio thought he was being driven back to Los Angeles. The car he was in stopped at a 7–Eleven. There, a man and a woman approached the car he was in and gave money to one of the men in the front seat. The man said it was fake and returned the money. Later, they went to petitioner's apartment. Cosio did not threaten the cousins or hear anyone threaten them, did not give orders or instructions, and was not paid. Cosio spent the night at petitioner's apartment. Petitioner left the next morning. The two men who had driven him to the 7–Eleven came to the apartment and took the cousins to another apartment. Later, Cosio went to the other apartment to ask for a ride. The man told Cosio to wait in the apartment. The apartment was locked from the outside. Cosio was inside the apartment when the police arrived.

## III

On June 4, 2002, petitioner filed Beltran I, and Judgment was entered on April 3, 2003, denying petitioner's habeas corpus petition on the merits. Petitioner appealed to the Ninth Circuit Court of Appeals, which affirmed the Judgment on November 2, 2004. *Beltran v. Roe*, 111 Fed. Appx. 970 (9th Cir.2004). Petitioner then filed a petition for writ of certiorari in the United States Supreme Court, which denied certiorari on April 5, 2005. *Beltran v. Yarborough*, 544 U.S. 966, 125 S.Ct. 1739, 161 L.Ed.2d 611 (2005).

On April 16, 2007, petitioner filed a motion in the Ninth Circuit for permission to file a second or successive petition in the district court, and such permission was denied on June 15, 2007. *Beltran v. Dexter*, case no. 07–71467. However, on April 27, 2007, petitioner filed an identical motion in the Ninth Circuit for permission to file a second or successive petition in the district court, and such permission was granted on August 2, 2007. *Beltran v. Salazar*, case no. 07–71809.

On October 3, 2007, petitioner filed the pending habeas corpus petition, his second habeas corpus petition under 28 U.S.C. § 2254.[6] On March 6, 2008, respondent filed a motion to dismiss the petition, and on April 21, 2008, petitioner filed an opposition.

Petitioner raises the following claims in the pending habeas corpus petition:

Ground One—The prosecutor failed to disclose material evidence favorable to petitioner, i.e., the prosecution's "star witnesses" had been induced to testify based on promises immigration authorities would permit them to remain in the United States in lieu of prosecuting and deporting them for illegal entry (Petition at 6a–6i);

Ground Two—"Newly discovered evidence of perjury by critical prosecution witnesses" shows petitioner is innocent and was convicted on the basis of false testimony (Petition at 6j–6k); and

Ground Three—Ineffective assistance of trial and appellate counsel in: (a) "failing to adequately or properly raise any of the foregoing claims at trial or on appeal"; and (b) "fail[ing] to sufficiently investigate the prosecution witnesses to determine that testimony concerning the defendants was false[ ] and to determine that the witnesses had been told they would be allowed to remain in the U.S., free of INS interference, prosecution, or deportation, in exchange for giving testimony favorable to the prosecution." (Petition at 6k–61).

## DISCUSSION

### IV

■ The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "greatly restricts the power of federal courts to award relief to state prisoners who file second or successive habeas corpus applications." *Tyler v. Cain*, 533 U.S. 656, 661, 121 S.Ct. 2478, 2481–82, 150 L.Ed.2d 632 (2001). For instance, Section 2244(d)(3), "creates a 'gatekeeping' mechanism for the consideration of second or successive applications in district court." *Felker v. Turpin*, 518 U.S. 651, 657, 116 S.Ct. 2333, 2339, 135 L.Ed.2d 827 (1996); *Stewart v. Martinez–Villareal*, 523 U.S. 637, 641, 118 S.Ct. 1618, 1620, 140 L.Ed.2d 849 (1998). Under this procedure, "[a]n individual seeking to file a 'second or successive' application must move in the appropriate court of appeals for an order directing the district court to consider his

---

**6.** To the extent petitioner seeks to consolidate this action with *Fonseca v. Hall*, CV 04–5836–CJC(RC), petitioner's request is denied since the Report and Recommendation has been filed in the Fonseca matter.

application," *Martinez–Villareal*, 523 U.S. at 641, 118 S.Ct. at 1620, and the appellate court "may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of" Section 2244(b). 28 U.S.C. § 2244(b)(3)(C); *Morales v. Ornoski*, 439 F.3d 529, 531 (9th Cir.2006).

■ Nevertheless, after the second or successive petition is filed, the petitioner has the burden of actually showing that each claim in his petition satisfies the requirements of Section 2244. *Tyler*, 533 U.S. at 660–61 n. 3, 121 S.Ct. at 2481 n. 3; *Cooper v. Brown*, 510 F.3d 870, 918 (9th Cir.2007); *Nevius v. McDaniel*, 218 F.3d 940, 944 (9th Cir.2000); *see also* 28 U.S.C. § 2244(b)(4) ("A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section."). Thus, "under section 2244(b)(4), the district court must conduct a thorough review of all allegations and evidence presented by the [petitioner] to determine whether the motion meets the statutory requirements for the filing of a second or successive motion." *United States v. Villa–Gonzalez*, 208 F.3d 1160, 1165 (9th Cir.2000); *Goldblum v. Klem*, 510 F.3d 204, 220 (3d Cir.2007), *pet. for cert. filed*, (Mar. 22, 2008). Specifically, Section 2244 requires that:

(A) the applicant shows that the claim [he raises] relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(B)(i) the factual predicate for the claim [he raises] could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2). Here, petitioner does not rely on a new rule of constitutional law; therefore, this Court must consider whether petitioner can show his "actual innocence." *Cooper*, 510 F.3d at 918. He cannot.

## V

■ Petitioner's three claims relate to the testimony against him at his trial: In Ground One, petitioner claims the prosecutor failed to disclose material evidence favorable to him, i.e., that the prosecution witnesses had been induced to testify against him based on promises they could remain indefinitely in the United States and not be deported; in Ground Two, petitioner claims "[n]ewly discovered evidence of perjury by critical prosecution witnesses"—namely the declarations purportedly executed by Judith and Janet Renteria and Joel Salcedo,[7] in which Judith and Janet recant some of their testimony—

---

**7.** The purported declarations are in Spanish with English "translations" attached. However, the translations are not by certified interpreters, or any identified person; thus, they are not properly authenticated and, as such, are inadmissible in this proceeding. *See Jack v. Trans World Airlines, Inc.*, 854 F.Supp. 654, 659 (N.D.Cal.1994) ("Witness testimony translated from a foreign language must be properly authenticated and any interpretation must be shown to be an accurate translation done by a competent translator."). Nevertheless, for the purpose of this opinion, the Court will assume *arguendo* the "translations" are accurate. Regarding the English "translations" of the two sisters' declarations, the Court notes the translations are identical except for the headings, the name of the declarant, and the last line. Although both sisters declare they were 16 at the time of petitioner's and Cosio's trial, that is not so. *See*

shows petitioner is innocent; and in Ground Three, petitioner claims ineffective assistance of trial and appellate counsel in failing to properly investigate the facts surrounding the prosecution witnesses. Assuming *arguendo* petitioner could not have earlier discovered the factual predicate for these claims, petitioner cannot show by clear and convincing evidence—or any evidence—that but for constitutional error no reasonable factfinder would have found him guilty of the underlying offenses of conspiracy to commit kidnapping for ransom, kidnapping for ransom and grand theft by larceny.

Initially, the purported declarations upon which petitioner relies were obtained after petitioner's trial by co-defendant Cosio. Petition, Exh. A. In their declarations, Judith and Janet claim Cosio never threatened them with any violence or held them against their will. *Id.* Additionally, Judith and Janet declare they testified untruthfully against Cosio to curry favor with the immigration authorities, stating:

> During the trial, I was confused and was very scared at that moment and thought that if I testified against Arnoldo [sic] Cosio, (aka Mono) I would not be deported to Mexico. After living through such a horrifying experience, I testified on the stand against Arnoldo [sic] Cosio, (aka Mono) out of anger. I was enraged, confused and mentally disturbed on the stand. My testimony in trial was based on the circumstances which around me [sic]. Arnoldo [sic] Cosio, (aka Mono) like me, had just arrived to the United States a few days prior.

*Id.* In the third declaration, both Janet and Joel Salcedo state that "[o]n June 15, 2000 the Immigration officer told us that we (Judith and Janet[ ] Renteria) were going

to be allowed to remain in the United States and that we would not be deported if we agreed to testify against the defendants." *Id.* Additionally, in the same declaration, Joel states he had a conversation with Deputy District Attorney Fernando Guzman prior to the preliminary hearing and Guzman told him not to say anything about the promise made to the sisters (Judith and Janet) by the immigration authorities " 'or else the whole case [would] fall apart.' " *Id.*

### A. *Brady Claim:*

■ The prosecution's willful or inadvertent suppression of evidence favorable to the accused violates due process when the evidence is material to guilt or punishment, *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), whether the evidence is exculpatory or impeaching. *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870, 126 S.Ct. 2188, 2190, 165 L.Ed.2d 269 (2006) (per curiam) (citations and internal quotation marks omitted); *Strickler*, 527 U.S. at 280, 119 S.Ct. at 1948. The petitioner has the "burden of showing that withheld evidence is material[,]" *United States v. Si*, 343 F.3d 1116, 1122 (9th Cir.2003); *United States v. Zuno–Arce*, 44 F.3d 1420, 1425 (9th Cir.), *cert. denied*, 516 U.S. 945, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995), and this Court must assess whether the withheld evidence is material "in the context of the entire record."[8] *United States v. Agurs*, 427

---

Evidentiary Hearing Reporter's Transcript ("EHRT") at 53:22–26 (Janet was approximately 22 years old at the time of petitioner's and Cosio's trial).

8. There is no separate "harmless error" analysis for *Brady* violations since " 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the pro-

U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976); *United States v. Jernigan,* 492 F.3d 1050, 1054 (9th Cir.2007) (en banc).

On June 13–14, 2005, the Los Angeles County Superior Court held a consolidated evidentiary hearing for petitioner, Cosio, and Francisco Fonseca. *See* EHRT 1:18–246:18. Judith and Janet Renteria, Deputies District Attorney James Daloisio and Fernando Guzman,[9] Detective Rafael Batres,[10] and Carol Altamirano[11] testified at the evidentiary hearing. *Id.* The trial court found Altamirano's credibility to be "greatly suspect." EHRT 240:11–241:25. The trial court also found Janet and Judith were credible witnesses. EHRT 239:22–240:18. With respect to Judith and Janet's declarations, however, the Superior Court found:

> [T]here is a strong probability that documents presented in court, the affidavits, of the two young ladies, in fact, were not signed at least in their final form. [¶] As to the supplemental, ... the young lady, Janet[ ], said, I don't even think that's my signature on there. These things [cast] grave doubts on the veracity of the information contained in the documents. I mean, she was so unconcerned—"she" being Ms. Altamirano—so unconcerned about the truth, that she didn't even take steps to proofread these things. [¶] She got them both being age 16. She used mirror-not even a mirror image, the exact same declaration for both of the young ladies without even

talking to the second one, that's according to her testimony. So I feel that there are grave doubts that the young ladies even signed the declarations that have made their way to court.

EHRT 241:17–25. Finally, the Superior Court found it could not draw any inference that there was an agreement to allow Judith and Janet to remain in the country indefinitely in exchange for their testimony. EHRT 237:4–22, 242:24–243:1. Specifically, the Superior Court determined:

> In terms of an agreement, here's what the agreement was. It was a tacit one that was understood by all parties, to wit, the young ladies wouldn't ... be[ ] deported **until the trial was over.** That was obvious to every counsel in the case it seems to me ..., including defense attorneys. The young ladies were not in custody. They were in the United States at the court proceedings. They had not been deported, certainly as of the conclusion of the second trial. [¶] So it was real clear that, certainly, there was this understanding that they wouldn't be. If they were going to be, they would have been in custody, or they would have already been deported and back here in some sort of a situation making it an appearance that had occurred....
>
> [¶] **But the state of the evidence is that at a minimum everyone knew the girls had not been deported. That they weren't going to be until the case**

ceeding would have been different,' necessarily entails the conclusion that the suppression must have had 'substantial and injurious effect or influence in determining the jury's verdict.' " *Kyles v. Whitley,* 514 U.S. 419, 435–36, 115 S.Ct. 1555, 1566–67, 131 L.Ed.2d 490 (1995) (citations and internal quotation marks omitted); *Singh v. Prunty,* 142 F.3d 1157, 1159 n. 5 (9th Cir.), *cert. denied,* 525 U.S. 956, 119 S.Ct. 388, 142 L.Ed.2d 321 (1998).

9. Mr. Daloisio prosecuted petitioner's preliminary hearing and Mr. Guzman prosecuted the trial against petitioner, Cosio and Jose Fonseca.

10. Mr. Batres is the El Monte police officer who investigated the kidnappings.

11. Ms. Altamirano is the relative of Cosio's who obtained the declarations that were the focus of the evidentiary hearing.

was over. And, further, that they had been promised that they wouldn't be prosecuted for somehow taking part in this initial scheme to get into the country illegally as arguably they would have been reliable [sic], perhaps, as co-conspirators, I don't know. But those were certainly the deals.

\* \* \*

All you've proved is that they didn't deport them, because they needed witnesses, and they weren't going to be deported until they testified.

EHRT 241:26–244:4. The Superior Court concluded:

[S]ince there was no deal, you don't even really get to the second portion[ ] of the Brady issue, which is, did the D.A. know about it and hide it, and was it material. There was no deal you haven't proven the first portion of it and, certainly, haven't proven the prosecutor was aware of any such situation, again. And all the testimony we have is quite to the contrary.

EHRT 244:6–12.

■■■ As an initial matter, even if the Superior Court had determined that the purported declarations were competent, credible evidence, Janet and Judith in their declarations never disavow their testimony about petitioner's part in the kidnappings—only Cosio's role. *See* Petition, Exh. A. To the contrary, they specifically reaffirm it was **petitioner** who kept them from leaving the apartment where they were being held, *id.*; thus, Janet and Judith's declarations do absolutely nothing to help petitioner. Additionally, the third declaration, even assuming the truth of its statements, at most, merely provides evidence that could have been used to impeach Janet and Judith when they testified. Thus, the new declarations certainly do not "establish by clear and convincing evidence that, but for constitutional error,

no reasonable factfinder would have found [petitioner] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2); *see also In re Fowlkes,* 326 F.3d 542, 547 (4th Cir.2003) ("[Petitioner's] *Brady* claim fails under section 2244(b)(2)(B)(ii) because [petitioner] cannot show that but for the *Brady* violation, no reasonable juror would have voted to convict."). Therefore, petitioner does not meet the requirements necessary to file a second or successive habeas corpus petition.

Nor is this the only reason to deny petitioner's successive petition. Rather, petitioner also cannot establish a violation of his constitutional rights. Here, petitioner has failed to rebut the Superior Court's factual findings by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and this Court must defer to the Superior Court's credibility findings. *See Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983) (Section 2254(d) "gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Sophanthavong v. Palmateer,* 378 F.3d 859, 867 (9th Cir.2004) ("Here, because the state court conducted an evidentiary hearing in which Mr. Sophanthavong testified, we are required to defer to the state court's credibility findings." (citations omitted)). As such, petitioner's *Brady* claim is without merit. Rather, as the Superior Court found, all counsel, including defense counsel, knew the witnesses were to stay in the United States while testifying at petitioner's trial. *See Strickler,* 527 U.S. at 281–82, 119 S.Ct. at 1948 (The government's suppression of evidence is a necessary element of a *Brady* claim); *Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972) (same).

**Actual Innocence:**

■■■ "[A] habeas petitioner asserting a freestanding innocence claim must go

beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." [12] *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir.1997) (en banc), *cert. denied*, 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998); *Osborne v. Dist. Attorney's Office for the Third Judicial Dist.*, 521 F.3d 1118, 1130–31 (9th Cir.2008). Yet, giving due deference to the Superior Court's findings of fact and credibility determinations at the evidentiary hearing, as detailed above, petitioner has **not** shown perjured testimony played any part in his conviction, *Cook v. Schriro*, 516 F.3d 802, 819 (9th Cir.2008), and certainly has not shown his actual innocence of the crimes of which he was convicted. *Jackson v. Calderon*, 211 F.3d 1148, 1165 (9th Cir.2000), *cert. denied*, 531 U.S. 1072, 121 S.Ct. 764, 148 L.Ed.2d 665 (2001); *Carriger*, 132 F.3d at 476.

**Ineffective Assistance of Counsel:**

 Since petitioner's *Brady* and actual innocence claims are without merit, and since petitioner has not shown his defense counsel failed to properly investigate the facts surrounding the witnesses, his ineffective assistance of trial counsel claims are also without merit, *see Rupe v. Wood*, 93 F.3d 1434, 1444–45 (9th Cir.1996) ("[T]he failure to take a futile action can never be deficient performance."), *cert. denied*, 519 U.S. 1142, 117 S.Ct. 1017, 136 L.Ed.2d 894 (1997); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir.) (counsel is not obligated to raise frivolous motions, and

failure to do so cannot constitute ineffective assistance of counsel), *cert. denied*, 513 U.S. 1001, 115 S.Ct. 513, 130 L.Ed.2d 420 (1994), as are his ineffective assistance of appellate counsel claims. *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir.2002) ("A failure to raise untenable issues on appeal does not fall below the *Strickland* standard."); *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir.2001) ("[Petitioner] cannot sustain his claim for ineffective assistance of appellate counsel because the issues he raises are without merit").

In short, petitioner has not met the necessary requirements to file a second or successive petition, or alternately, the second or successive petition fails on the merits.

## RECOMMENDATION

IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) adopting the Report and Recommendation as the findings of fact and conclusions of law herein; and (3) directing that Judgment be entered denying petitioner's request to file a second or successive petition, or alternatively, denying the petition and dismissing the action with prejudice.

## JUDGMENT

MANUEL L. REAL, District Judge.

Pursuant to the Order of the Court adopting the findings, conclusions, and rec-

---

**12.** Since petitioner raises his actual innocence as a separate claim, the Court addresses it as a freestanding actual innocence claim. "[I]t is presently an open question" in the Supreme Court whether "a freestanding actual innocence claim is ... cognizable under federal law[,]" and, if so, "whether there should be a distinction between capital and non-capital cases...." *Osborne*, 521 F.3d at 1130; *see also House v. Bell*, 547 U.S. 518, 554–55, 126 S.Ct. 2064, 2086–87, 165 L.Ed.2d 1 (2006) (declining to resolve wheth-

er freestanding actual innocence claim can be maintained); *Herrera v. Collins*, 506 U.S. 390, 417, 113 S.Ct. 853, 869, 122 L.Ed.2d 203 (1993) (assuming without deciding "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim"). In any event, for the reasons discussed herein, petitioner's claim of innocence fails no matter what standard applies.

ommendations of United States Magistrate Judge Rosalyn M. Chapman,

IT IS ADJUDGED that petitioner's request to file a second or successive petition is denied, or alternatively, the petition is denied and the action is dismissed with prejudice.