Filed 11/12/13  P. v. Stewart CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>DEANTE STEWART,<br><br>          Defendant and Appellant. | A136221<br><br>(Solano County<br>Super. Ct. No. FCR291353 &<br>FCR290834)<br><br>ORDER MODIFYING OPINION AND<br>DENYING PETITION FOR REHEARING<br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the nonpublished opinion filed herein on October 21, 2013, be modified to delete in its entirety the last sentence in the first full paragraph on page 19, beginning with the words, "Unlike in the present case, . . . ."

This modification does not effect a change in the judgment.

The petition for rehearing is denied.

Dated: _____          _____
                                                                        P.J.

Filed 10/21/13 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>DEANTE STEWART,<br><br>      Defendant and Appellant. | A136221<br><br>(Solano County<br>Super. Ct. No. FCR291353 &<br>FCR290834) |

Defendant Deante Stewart appeals after conviction of two counts of second degree robbery, one count of assault with a firearm, and one count of possession of a firearm by a convicted felon. (Pen. Code, §§ 211, 245, subd. (a)(2), 29800, subd. (a)(1).)[1] Defendant personally used a firearm in each of the first three counts and had one prior strike conviction and one violent prison prior. (§§ 667, subd. (b)-(i), 667.5, subd. (b), 1170.12, subds. (a)-(d), 12022.5, subd. (a)(1), 12022.53, subd. (b).) He was sentenced to more than 21 years in prison. He claims his convictions must be reversed because he was denied discovery of a police report relating to a similar crime committed while he was in custody by an individual with a similar appearance, and because the court did not allow him to present a third party culpability defense based on that other crime. We find no error and we affirm.

---

[1] Statutory references without code designation are to the Penal Code.

## BACKGROUND

**The prosecution's case**

On February 11, 2012, about 7:00 p.m., Arthur Hernandez and his friend Michael Shishido were accosted from behind by an armed man as they were walking through a lawn area on their way to Hernandez's apartment in a gated community in Fairfield known as the Parkland apartments. The man demanded money, so Hernandez threw his wallet to the ground near the robber. The wallet held no cash, only expired credit cards and Hernandez's driver's license and social security card. The robber picked up the wallet, then pointed his gun at Shishido and demanded money from him. The robber hit Shishido on the back of his head with his gun, so Shishido took a $10 bill from his pocket and gave it to the robber. Shishido testified the robber also kicked him in the leg. The robber took off northbound, toward the entry gates to the apartment complex.

Hernandez and Shishido continued walking to Hernandez's apartment. Hernandez's girlfriend had been walking with them just before the robbery but had "slithered away" during the robbery. When Hernandez discovered she was not in the apartment, he went to look for her. As he approached the entry to the apartment complex he saw the robber standing with a woman, talking to someone in a car. He "couldn't believe" the man was still in the vicinity.

Hernandez returned to his apartment as Shishido was describing the robber to a 911 operator. Shishido described the robber as a 25-year-old African American with dreadlocks and a cap. Hernandez described him as Black, in his 20's, with long dreadlocks and a white baseball cap, wearing a gray or silver pullover hooded sweatshirt and jeans.

After hearing a description of the robber broadcast, Fairfield Police Officer Joshua Kresha spotted defendant walking on a nearby street with a woman. Defendant was wearing a baseball cap and a gray sweatshirt, and he had long dreadlocks. Kresha pulled his patrol car up behind the two, got out of his car, drew his firearm, and ordered defendant to the ground. The woman walked on and Kresha could not identify her.

Kresha searched defendant but found nothing connecting him to the crime: no gun, no wallet, and no $10 bill.

After police interviewed Hernandez and Shishido, they took the men to the Foster Lumberyard, about a block away from the Parkland apartments, for a field show up. The show up occurred some five to fifteen minutes after the crime. Both Hernandez and Shishido individually and independently identified defendant as the robber. Hernandez immediately recognized him and testified at trial he had "no doubt" about the identification. Shishido also told the police he was "absolutely" "one hundred percent certain" of the identification and testified at trial he had "no doubt."

Kresha told Fairfield Police Officer Patrick High that defendant was accompanied by an unidentified female at the time of his arrest. After participating in the field show up at the lumberyard, High went to the Travis Lodge in Fairfield (about a block and a half from the Foster Lumberyard) because he had had a previous contact with defendant and a female at that location. He asked the desk clerk if either defendant or his woman friend was registered there. The clerk knew the woman, Dewaynna Gross,[2] as a frequent guest at the hotel and told High she had been in the hotel in the vending machine area before the police arrived.

High found Gross sitting in a stairwell of the hotel. He searched her with her consent but found neither the fruits of the robberies nor a gun. However, when High checked the area near the vending machines he found a loaded gun under the ice machine. The hotel clerk had not seen Gross hide a gun under the ice machine, but he had not been watching her the entire time she was in that area. The police also searched along the path Gross presumably would have traveled to the hotel from the area where defendant was arrested, but they never found Hernandez's wallet or the $10 bill Shishido had given the robber.

---

[2] Defendant and Gross were jointly charged with a robbery on January 1, 2012, in case no. FCR291353, and were jointly charged in the current offense in FCR290834. The charges against Gross were resolved prior to trial. All charges from both dates were charged against defendant in a consolidated information in no. FCR291353. The charges stemming from the January 1 events were dismissed by the prosecutor at the start of trial because the victim could not be served.

The gun found under the ice machine was a .380-caliber, semiautomatic, with a predominantly black finish. No usable fingerprints were found on the weapon. It was registered to a San Leandro man who had no connection to defendant or anyone else involved in the case. He believed the gun had been stolen by a house guest in September 2011, but there was no evidence to implicate defendant or Gross in the theft.

Hernandez and Shishido both testified at trial that the gun found under the ice machine could have been the one used in the robbery, but neither man was sure. Neither was familiar with firearms. Shishido thought the gun he saw during the robbery was silver or shiny and appeared bigger when the robber had it. Hernandez testified it was black, and he thought it was a revolver. Hernandez had previously told police the gun the robber used was a semiautomatic.

On March 30, 2012, a correctional officer at the Solano County Jail attempted to conduct a live lineup with defendant at the request of defendant's attorney. Hernandez and Shishido showed up to view the lineup, but defendant refused to participate, saying, "Are you guys deaf? I'm not going in. Didn't you hear me?" Consequently, no lineup was conducted.

The parties stipulated at trial that defendant had previously been convicted of a felony for purposes of the felon in possession count.

**The defense case**

Defendant did not testify. On cross-examination, Shishido admitted he had tested positive for methamphetamine a month before the robbery, when he was on probation. Defense counsel asked several questions obviously intended to elicit that Shishido had bought methamphetamine from defendant in the days preceding the alleged robbery. Shishido denied all such accusations, however, and denied that the robbery incident was related to a methamphetamine transaction.

Counsel also called one of the officers who had interviewed the victims at the crime scene, eliciting that Hernandez had not provided as much detail during preliminary interviews as he had testified to at trial. Hernandez was unable to describe the robber's facial features immediately after the offense.

Defense counsel argued in closing that Shishido had been trying to purchase methamphetamine from defendant on the evening of the alleged robberies and was not satisfied with the amount he received. Inferably, Shishido and Hernandez therefore sought revenge by falsely accusing defendant of robbery and assault.

**The judgment**

Defendant was convicted by jury verdict on all counts on June 4, 2012. The prior conviction allegations were bifurcated and tried to the court, which found the allegations true. On July 27, 2012, defendant was sentenced to 21 years, four months, in prison based in large part on his prior record, multiple offenses, and use of a firearm.

## DISCUSSION

Before trial, defense counsel moved for permission to put on a defense of third party culpability with respect to two incidents she wanted to explore for purposes of presenting evidence of such third party culpability. After being permitted to inspect the police reports, she withdrew her request with respect to one of the incidents. The trial court denied counsel's request for a copy of the other report, ruling the crime was not sufficiently similar to make the incident admissible as third party culpability evidence. Defendant argues the court erred. In addition, defendant contends he was entitled to a copy of the police reports under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

**Background**

Defense counsel filed a motion to introduce "evidence that a third party, who may currently still be at large, is the perpetrator of the offenses charged in the above entitled cases." The motion claimed there were two other crimes so similar to the one with which defendant was charged that the jury might reasonably believe the perpetrator of those crimes (committed while defendant was in custody) must also be the one who committed the Hernandez-Shishido robbery.

The first incident was a robbery on April 2, 2012, in Fairfield in which the perpetrator was described as a "black male with dreads wearing a gray sweatshirt and armed with a handgun." The second incident was a carjacking in Fairfield on April 11, 2012. "During that incident, an individual approached and then struggled with the

occupant of a car and hit him in the head with a handgun, ultimately stealing the vehicle. The perpetrator is described as a black man in his mid-20s with long dreadlocks, a black hooded sweatshirt and black pants."

The motion claimed the police sketch of the second suspect shows "a black man with hair that is virtually identical to Mr. Stewart's with a broad face and facial features." Defendant argues on appeal the two men were so similar in appearance they could be twins. We cannot assess defendant's characterization due to an inadequate record.[3]

At the hearing on the motion, the court allowed defense counsel to inspect the police reports, neither of which was lengthy. The court then offered defense counsel a chance to look over the reports, and she acknowledged on the record, "I have had a chance to briefly review the reports." While there is no indication in the record as to whether counsel had the opportunity to take notes on what she read, she clearly had digested the contents. For example, with respect to the carjacking, defense counsel had sufficiently absorbed the information in the police report that she was able to recite the suspect's height, weight, hair length and style. The only other similarity she reported was that the carjack victim also reported being "hit in the head with a phone," which she evidently considered comparable to Shishido's being hit in the head with a gun.

After reading the reports, counsel withdrew her motion with respect to the April 2, 2012, incident because it was "a different type of incident." However, defense counsel maintained the defense was entitled to a copy of the police report on the April 11 incident so she could "investigate" the matter further.

The prosecutor opposed the motion. She argued that evidence of third party culpability should be excluded under Evidence Code section 352 because such evidence

---

[3] Defendant has not provided us with a record from which we can validate any such claim. The sketch of the carjacker is nothing more than a small rudimentary sketch of an African American with long dreadlocks, with indistinct facial features (in part due to poor photocopy quality). The photograph of defendant with which we have been provided is a photo array of six different men, with defendant in the number three position, all of whom appear to have dreadlocks (even that fact is not certain, the quality of the photocopy is so poor). But the photocopy of defendant in the lineup is of such poor quality that we cannot make out any of his facial features, much less could we agree with defendant that the drawing was close enough to be his "twin." It was defendant's burden to provide us with a sufficient record on appeal to review the issues he raised. (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 132; *People v. Neilson* (2007) 154 Cal.App.4th 1529, 1534.) We have no basis in the record for comparing defendant's appearance with that of the April 11 carjacker.

would tend to confuse and mislead the jury, particularly because the suspect had not been identified in the April 11 incident. The prosecutor said, "If the defense is allowed to bring in every male black with dreadlocks in Fairfield who committed crimes similar to this, robberies with guns and carjackings, we could just open up the flood gates." The prosecutor argued there were inconsistencies in the two crimes (most significantly that one was a carjacking and one an armed robbery), and asserted the official information privilege, emphasizing the carjacking case was an "unsolved incident."

The prosecutor's opposition stated "there is no evidence linking anyone other than the defendant to this crime . . . ." She argued the police reports should not be released to defense counsel because they involved ongoing investigations and their release would "violate privacy interests of the victims and witness in those cases . . ."

The court took the motion under submission to "review the report again and some additional points and authorities." Several days later it denied the defense motion, reasoning as follows:

"THE COURT: [¶] . . . [¶] I'm going to deny the motion to allow third party culpability evidence. I just do not see any sufficient showing that the party responsible for these unsolved robberies was in any way involved in the matters for which Mr. Stewart is charged. And the fact that the suspect in these other matters is of the same ethnic background as Mr. Stewart, and wears his hair in the same fashion, and approximately the same age, is not in and of itself convincing to the Court in any way. So the request does not cause the Court to believe that there is any type of reasonable probability it's the same individual, or it's the type of evidence that would likely raise a reasonable doubt to the jury hearing this matter. The motion for third party culpability is going to be denied."

After hearing defense counsel's argument, the court continued: "Well, I am just not prepared to order the police department to release its investigation into ongoing, serious criminal matters based on the showing that's been made. There is nothing in the circumstances of that report that the Court reviewed, and allowed counsel to review, that

is at all similar to the type of robbery that occurred to what Mr. Stewart is being charged with, and so the request for the release of that information will be denied."

We are at a disadvantage in reviewing this issue, since we do not have access to the police reports in question, nor do we have a clear basis for comparison of defendant's appearance with that of the unidentified carjacker. (See fn. 3, *ante*.) We note that defense counsel could have—but did not—request that a copy of the police reports be filed under seal. (Cal. Rules of Court, rules 2.550-2.551.) Neither she nor appellate counsel took any action to secure a copy of the police report for our review. All the more reason for us to defer to the trial court so long as its ruling was not an abuse of discretion. We have no basis for such a finding on this record.

## Evidence of Third Party Culpability

Defendant contends, "The trial court erred in denying defendant's trial counsel's request for access to the police reports of the robbery committed in April in order to investigate and present the defense of mistaken identity." He further contends, "The trial court erred in excluding evidence that there was an armed robber active in Fairfield at the time of the Parkland robbery who looked and dressed very much like appellant and used robbery tactics identical to those used in that robbery."

First, we note that defense counsel was not entirely denied access to the report; she was denied a *copy* of it. More fundamentally, we find there was not sufficient similarity between the two crimes or criminals to make the report admissible as evidence of third party culpability. If defense counsel wanted to pursue this line of defense she could have conducted further investigation based on what she saw in the police reports.

"It is a defense against criminal charges to show that a third person, not the defendant, committed the crime charged. (*People v. Hall* (1986) 41 Cal.3d 826, 832.) A criminal defendant has a right to present evidence of third party culpability where such evidence is capable of raising a reasonable doubt as to his guilt of the charged crime. However, as the Supreme Court explained in *People v. Hall*, 'we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability . . . . [E]vidence of mere motive or opportunity to commit the crime in another person,

without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' ( *Id*. at p. 833.)  In addition, on appeal, the defendant must show prejudice from the erroneous denial of discovery.  (*People v. Memro* (1985) 38 Cal.3d 658, 684.)" (*People v. Jackson* (2003) 110 Cal.App.4th 280, 286.)

Trial courts should "simply treat third-party culpability evidence like any other evidence:  if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352)." (*People v. Hall, supra,* 41 Cal.3d at p. 834.)  In *People v. Elliott* (2012) 53 Cal.4th 535 (*Elliott*), the Supreme Court further explained the relevancy inquiry:  " '[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt . . . must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352.' [Citations.]  Evidence of a third party's prior crimes is inadmissible to establish the third party's criminal propensity. [Citations.] For evidence of an uncharged offense to be admissible to establish the third party's identity as the perpetrator of the charged crimes,' "[t]he pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." ' [Citations.]  A large number of common marks may, when viewed in combination, establish the required distinctive pattern.  [Citation.]  A trial court's ruling excluding third party culpability evidence is reviewed for abuse of discretion.  [Citation.]" (*Id.* at pp. 580-581; see also, *People v. Hall*, *supra*, 41 Cal.3d at pp. 833-834.)

The link between the robber in the case before us and the carjacker in the April 11 crime was simply too tenuous.  The court did not abuse its discretion in finding it inadmissible—and not subject to further discovery—when balanced against the People's interest in confidentiality and third party privacy interests.

The Supreme Court rejected a similar argument in *People v. Brady* (2010) 50 Cal.4th 547, where a defendant accused of murdering a police officer sought to introduce  hotline tips from the public concerning the murder, including a recorded confession (later recanted) and an unsigned letter claiming responsibility for the murder. The court also excluded evidence that another individual resembled the composite drawing of the killer and evidence intended to link an Asian man with the killing because he had killed two other police officers.[4]  The trial court excluded evidence of all those tips on relevance grounds.  (*Id*. at p. 557.)

The Supreme Court concluded "the trial court did not abuse its discretion in excluding the four clues, as the proffered evidence suggested no link between the third parties and the actual perpetration of [the officer's] murder." (*People v. Brady*, *supra*, 50 Cal.4th at p. 558.)  With respect to the unsigned letter claiming responsibility, the court observed:  "Third party culpability evidence that does not identify a possible suspect is properly excluded.  (See *People v. Sandoval* (1992) 4 Cal.4th 155, 176-177.)" (*Id*. at p. 559.)  And even assuming the trial court erred in excluding evidence of the hotline tips, the error was not prejudicial under either the state or federal standard of review.  (*Id*. at p. 559.)

In *People v. Page* (2008) 44 Cal.4th 1, the defendant claimed two other men were potential suspects in the offense of which he was convicted, but they had not been thoroughly investigated.  (*Id.* at pp. 35-36.)  The Supreme Court found no abuse of discretion in excluding evidence of their possible culpability "because it did not link any third person to the actual perpetration of the crime."  (*Id.* at p. 37.)  "[T]here must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime," as opposed to simply showing that the person had the motive or opportunity to

---

[4] As to that clue, several eyewitnesses to the police officer's murder "described the assailant as an Asian male and the clue referred to an Asian male who had killed two members of a nearby police department and was suspected of committing an armed robbery." (*People v. Brady*, *supra*, 50 Cal.4th at p. 558.)  "[N]o evidence implicated this person" in the murder for which defendant was on trial. (*Ibid*.)  "Although the man's ethnicity and his possible involvement in an unrelated robbery and killing of other police officers initially might have suggested some involvement" in the murder of which defendant was accused, "defendant presented no evidence actually linking this person" to the murder in question.  (*Ibid*.)

commit the offense. (*Id.* at p. 38.) (See *Holmes v. South Carolina* (2006) 547 U.S. 319, 327 [noting "widely accepted" rule that third party culpability evidence that does not sufficiently connect the third party to the crime may be excluded].)

In the case before us the argument in favor of admissibility is even weaker. The argument was similar to that in *Page*—that the police nabbed the wrong man and failed to investigate another potential suspect—but the unidentified "other suspect" was deemed a suspect by defendant alone. And defendant claimed he was a suspect based on nothing more substantial than superficial resemblance and his use of a gun in another crime.

The trial court did not abuse its discretion in denying defense counsel's request to copy police reports and introduce evidence of third party culpability. First, the suspect in the April 11 Fairfield carjacking had not been identified. The investigation into that crime was ongoing. As noted above, "[t]hird party culpability evidence that does not identify a possible suspect is properly excluded." (*People v. Brady, supra,* 50 Cal.4th at p. 559; see also, *Jackson, supra,* 110 Cal.App.4th at p. 288 ["the defense value of . . . other similar crime files was tenuous unless the crimes were solved"].)

Second, there was no evidence to "link the third person either directly or circumstantially to the actual perpetration of the crime." (*Elliott, supra,* 53 Cal.4th at p. 580.) Defense counsel argued the police sketch of the suspect in the carjacking resembled defendant. Counsel also argued the crimes were similar because the carjacker used a handgun and struck the victim on the head. However, there was no evidence linking the suspect to the robberies committed against Hernandez and Shishido.

Third, there was nothing remotely approaching a "pattern" in the two crimes "so unusual and distinctive as to be like a signature." (*Elliott, supra,* 53 Cal.4th at p. 581.) One crime was a run-of-the-mill street robbery and the other a seemingly ordinary carjacking. The February incident involved a demand for money and the April incident involved the demand for a cell phone and the taking of a vehicle. The fact that guns were used in both incidents is not unusual or distinctive, nor is the fact that the perpetrator in both instances struck the victim with his gun. Such details are depressingly familiar and common.

Moreover, there were distinct differences between the two crimes. The robbery of Hernandez and Shishido was committed at approximately 7:00 p.m., while the carjacking was committed at 1:40 a.m. The robbery occurred in the common area of a private residential complex. The carjacking apparently occurred at an intersection of two public streets. The robber in February took off on foot, while the carjacker drove off in the victim's car.

Finally, the prosecutor urged the court to exclude the evidence under Evidence Code section 352. " 'Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.]' [Citation.] A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion." (*People v. Lewis* (2001) 26 Cal.4th 334, 374.) Allowing the defense to introduce evidence of the unsolved April carjacking would have sidetracked the jury with evidence of an unsolved crime involving an unknown suspect with no proven connection to the crimes in this case. The result would have been jury confusion and undue consumption of time.

**Failure to provide defense counsel with a copy of the April 11 police report**

The trial court also was well within its discretion in refusing to provide a copy of the police reports to defense counsel, having based its decision in part on the fact that the carjacking had not been solved and involved an ongoing investigation. The prosecution asserted the official government privilege under Evidence Code section 1040 in response to defendant's request for copies of the police reports. "Ongoing investigations fall under the privilege for official information. (Evid. Code, § 1040.) Moreover, the victims have a constitutional right of privacy. (Cal. Const., art. I, § 1.) Both of these factors weigh heavily against a criminal defendant's right to potentially exculpatory material." (*Jackson*, *supra*, 110 Cal.App.4th at p. 287.) Evidence Code section 1040 expressly requires the "necessity for preserving the confidentiality of the information" to be weighed against "the necessity for disclosure in the interest of justice." (Evid. Code, § 1040, subd. (b)(2).)

Two cases cited to the court below dealt specifically with "whether a defendant's entitlement to potentially exculpatory material outweighs the official information privilege and a victim's privacy rights": *Jackson, supra*, 110 Cal.App.4th at page 288 and *People v. Littleton* (1992) 7 Cal.App.4th 906.

A " 'trial court has discretion " 'to protect against the disclosure of information which might unduly hamper the prosecution or violate some other legitimate governmental interest,' " or when there is an " 'absence of a showing which specifies the material sought and furnishes a "plausible justification" for inspection . . . .' " [Citation.] Although policy may favor granting liberal discovery to criminal defendants, courts may nevertheless refuse to grant discovery if the burdens placed on government and on third parties substantially outweigh the demonstrated need for discovery. [Citations.]' [Citation.]" (*Littleton , supra*, 7 Cal.App.4th at p. 910.) *Littleton* held the privacy interests of victims and citizen witnesses in those cases outweighed the "tenuous and speculative" benefit to defendant in discovering those police reports. (*Id*. at p. 911.)

In *Littleton* the defendant had requested copies of police reports in 12 other burglary-rape cases in the same geographic area where defendant's crime had occurred, in which no suspect had been identified and the defendant had not been eliminated as a suspect. (*Littleton, supra,* 7 Cal.App.4th at pp. 909-911.) "Because no one had been arrested or charged with those other crimes in this case, the information in the reports would have been of no value to the defendant unless he was able to *solve* the other crimes and identify the perpetrator. . . . Weighed against this speculative benefit was the government's legitimate need for confidentiality of ongoing police investigations and the privacy interests of the victims and witnesses identified in those other reports." (*Id.* at p. 911.) A similar result was reached in *Jackson, supra*, 110 Cal.App.4th at pp. 288-289, which involved a challenge based on both state statutory and federal constitutional grounds.

The courts in *Jackson* and *Littleton* distinguished a case in which a defendant was granted discovery of police investigation files of similar crimes on grounds that the other crimes in that case had been solved and other individuals had been charged with their

commission. "[T]his distinction is critical: the government's interest in maintaining confidentiality in a case of ongoing investigation is far greater than in a case where a suspect has been charged and the matter has entered the public view through the court system." (*Jackson*, *supra*, 110 Cal.App.4th at p. 288; see also *Littleton*, *supra*, 7 Cal.App.4th at pp. 910-911.)

The court here fully reviewed the police report in question. Following that review, the trial court saw no striking similarities between offenses or offenders such as to render admissible evidence of the carjacking. Indeed, defense counsel, having reviewed the whole report, came up with no explanation about why she needed a copy of it except to locate the victim and possibly other witnesses and to "investigate" the matters contained in the police report. She did not point out any additional details contained in the reports that needed follow-up. On appeal defendant proposes only that the victim of the carjacking could have testified that defendant looked a lot like the carjacker. It seems to us that, having reviewed the police report, defense counsel probably gleaned enough information to follow up with the victim if she deemed it necessary.

Moreover, defendant himself could have testified he was not involved in the robbery and told the jury, as he did the arresting officer , that another man in the immediate vicinity resembling him in appearance and hairstyle and wearing identical clothing was the actual culprit.[5] He elected instead to have his attorney present the drug-deal-gone-bad defense.

Finally, any error in excluding evidence of third party culpability was harmless under either the state or federal standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) The evidence against defendant was compelling. Both Hernandez and Shishido identified him near the crime scene moments after they were robbed. They were absolutely positive about their identification both at the crime scene and at trial. A gun similar to the one

---

[5] The court ruled before trial that if defendant testified, the jury could be told that he suffered felony convictions in 2006 and 2008. Defendant had prior felony convictions for two robberies and a prior conviction for grand theft from the person, which was originally charged as a robbery.

used in the robbery was found in a location where defendant's female companion had gone shortly after the robbery. And finally, defendant refused to participate in a live lineup at the jail, which tended to show consciousness of guilt. Even if evidence of the April 11 carjacking had been admitted, there is no reasonable possibility or probability defendant would have received a more favorable outcome. (*Chapman*, *supra*, 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at p. 836.)

**Brady v. Maryland**

Defendant contends, "Evidence that a very similar crime has been committed by someone other than the defendant is potentially exculpatory evidence which must be disclosed under *Brady v. Maryland*." Under *Brady*, the prosecution violates a defendant's right to due process if it withholds exculpatory evidence—that is, evidence "favorable to the accused"—material to the defendant's guilt or punishment. (*Brady, supra,* 373 U.S. at p. 87.) Evidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. (*Cone v. Bell* (2009) 556 U.S. 449, 469-470.) A "reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.' " (*Smith v. Cain* (2012) __ U.S. __, 132 S.Ct. 627, 630, quoting *Kyles v. Whitley* (1995) 514 U.S. 419, 434.) On a claim of *Brady* violation, we review the record independently. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)

As the Attorney General points out, "[t]here is no *Brady* violation 'where a defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory information," or where the evidence is available . . . from another source,' because in such cases there is really nothing for the government to disclose. [Citations.]" (*Coe v. Bell* (6th Cir. 1998) 161 F.3d 320, 344.) "When, as here, a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government." (*United States v. Aichele* (9th Cir. 1991) 941 F.2d 761, 764.)

In this case defendant's *Brady* claim fails because the defense had access to the key information concerning the carjacking on April 11, 2012. Indeed, defense counsel attached a copy of the police sketch of the carjacking suspect to her motion to admit evidence of third party culpability. During the hearing on the motion, the court permitted defense counsel to personally review the police reports. Though the court refused to give her a copy of the report relating to the carjacking, there is no reason to think she could not have made a mental note of the victim's name and pursued further investigation as warranted.

Even after reviewing the report she was not able to list any truly significant similarities between the robbery of Hernandez and Shishido and the April 11 carjacking. The only additional information she provided was that the carjacker was five feet, eight inches tall and weighed 150 pounds, whereas defendant was five feet, six inches tall and weighed 140 pounds. Defense counsel acknowledged the height and weight of the two suspects were "inconsistent."[6]

Other than that, she continued to argue the same factors she had in her written motion based on the police sketch and accompanying press release alone: the robber and carjacker were of the same race, both had shoulder-length dreadlocks, both wore hoodies, both used guns, and both pistol-whipped their victims. These are the same factors defendant now argues on appeal. This strongly suggests the police report itself offered no additional details about the carjacking or the carjacking suspect to support a finding of similarity between the two crimes. For instance, we think it is fair to infer that the police report said nothing about the carjacker having acne, or defense counsel would have pointed that out to the court. In the absence of some more distinctive trait of appearance, and in the absence of a distinctive modus operandi, it is doubtful such evidence can be considered truly "exculpatory" within the meaning of *Brady*. But even assuming for purposes of argument the evidence was "exculpatory," we cannot find it material.

---

[6] Defendant asks us to construe the record as a mistranscription, insisting defense counsel must have said the two men's heights and weights were "consistent." We decline to do so. Given the two-inch and ten-pound discrepancy between the two descriptions, it is entirely possible defense counsel understood the descriptions to be "inconsistent."

In determining the materiality of evidence allegedly suppressed by the prosecution, we consider both the probative force of the evidence that was withheld from the defense and the strength of the evidence actually presented. The more uncommon the physical characteristics of the defendant which are shared by the criminal at large, the stronger the probative value of the unsolved crime. Similarly, the more the manner in which the two crimes share uncommon and "signature-like" features, the more likely it is the evidence of the unsolved crime may be considered material. The tenuous connection between the two criminal episodes in this case makes the probative value of the evidence weak at best.

It is questionable whether evidence that a perpetrator of a similar height, weight, and ethnic background also committed a robbery on a date when the defendant was in custody—without more—can rightly be considered "favorable" to the defense. Yet, in this case the physical features that suggested the robber and the carjacker were the same person were nothing more than generic characteristics, such as age, race, and hairstyle. The heights and weights were not identical. The clothing styles were similar but not identical, and were common among young men in defendant's age group. The police report on the present crime notes that defendant has acne, whereas, so far as we can discern, no such observation was made about the carjacker.[7]

Nor was the mere use of a handgun—either as a means of intimidation or in the pistol-whipping that occurred in each case—an unusual factor in today's crimes. There was no "signature" modus operandi. The crimes were not even the same, one being a garden-variety armed robbery and the other being a seemingly ordinary carjacking.

In similar circumstances *Jackson, supra,* 110 Cal.App.4th 280, cited by the People below, applied the rationale of *Littleton, supra,* 7 Cal.App.4th 906, in the context of a *Brady* claim. The court held it was proper under both statutory discovery rules and *Brady* to deny a burglary-rape defendant discovery into police investigative files of other burglary-rapes in the area. (*Jackson, supra,* at pp. 284-285, 288-289, 291.) This was true

_____

[7] The police report itself has not been made available for our review.

even though one of three crimes on which discovery was sought "shared many similarities with the crimes charged against appellant, including the time and location of the attack, mode of entry, nature of the touchings, flight of the suspect and his initial description." (*Id.* at *supra,* at p. 287.)

Defendant distinguishes *Littleton* and *Jackson* on grounds that he can be eliminated as a suspect in the April 11 carjacking because he was in custody when that offense was committed, whereas the defendants in *Littleton* and *Jackson* could not be eliminated as suspects in the other cases. However, defendant's argument essentially boils down to this: a criminal defendant is entitled to discover police investigative files related to all similar (not even identical) unsolved crimes in the same city where the charged offense occurred, at least insofar as the perpetrator in those cases resembled the defendant in height, weight, race, hairstyle and clothing style, the crimes bore some generic similarities such as gun use, and the defendant may be eliminated as the perpetrator of the second offense. We cannot carry either *Brady* or the defendant's right to discovery that far. There must be something more distinctively similar about the crimes or the criminals to warrant the burdens inherent in requiring such disclosure. Commonplace similarities in appearance, such as age, height, weight and race, are insufficient.

Defendant relies almost exclusively on *United States v. Jernigan* (9th Cir. 2007) 492 F.3d 1050 (*Jernigan*), in which a diminutive Hispanic woman with acne or pock marks on her face was convicted of bank robbery after allegedly robbing three banks. While she was in custody and awaiting trial, three more bank robberies were committed in the area by a woman "whose description bore an uncanny physical resemblance" to Jernigan's. (*Id.* at p. 1051.) "Although the prosecution knew that other nearby banks had been robbed by a diminutive, Hispanic female with poor skin after Jernigan's arrest, the prosecution failed to relay this information to defense counsel." (*Ibid.*) The government did not dispute "that the evidence of an additional bank robber matching Jernigan's description was favorable to Jernigan and that the government failed to provide it to defense counsel . . . ." (*Id.* at p. 1053.) The only issue in dispute was whether the

evidence was material. (*Ibid*.) Unlike in the present case, a specific individual had been arrested and charged with the later bank robberies. (*Id*. at p. 1052.)

After reviewing the evidence as well as national statistics showing "only six percent of all bank robbery perpetrators were female" in the year the robberies took place, and "[o]nly six percent of bank robbers overall (male and female) were Hispanic," the Ninth Circuit concluded the evidence was material and Jernigan was prejudiced by its suppression. (*Jernigan, supra,* 492 F.3d at p. 1056.) The holding of *Jernigan* applies to an accused and another known or believed to have committed a similar crime who both have "phenotypically similar" traits. (*Id*. at p. 1053.)

Of particular significance in our view was that both Jernigan and the other accused robber had acne or pock marks on their faces. This unusual coincidence of largely inalterable physical features, together with the low crime statistics for the defendant's sex and ethnic group, appears to have had a major impact on the court's decision.

There are several important distinctions between our case and *Jernigan*. First, the crime committed by the bank robber in *Jernigan* was identical to the defendant's crime (i.e., bank robbery), and in fact she robbed the same bank branch that defendant was convicted of robbing. (*Jernigan, supra,* 492 F.3d at p. 1052.) Common experience tells us bank robberies are less common than street robberies such as that involved in our case. Indeed, in our case defendant sought to introduce evidence of a suspect in an entirely different crime, namely a carjacking. Although both the robber and the carjacker carried guns and used their weapons to strike their victims on the head, these are not distinctive or unusual features of such unfortunately common crimes. None of the behavior of the April 11 carjacker makes his conduct or existence material in the present case.

As for his appearance, the defendant in *Jernigan*, had an "uncanny physical resemblance" to a still active bank robber. (*Jernigan, supra,* 492 F.3d at p. 1051.) "[B]oth women were roughly five feet tall, Hispanic, and had acne or pock-marked complexions." (*Id*. at p. 1051, fn. omitted.) This combination of unusual physical features was "noteworthy" to the court's decision. (*Id.* at p. 1051.)

In this case, there was no evidence of a "noteworthy" or "uncanny" resemblance. The carjacker was reported to be two inches taller than defendant (5 feet 8 inches versus 5 feet 6 in ches) and ten pounds heavier. Neither the individual similarities pointed out by defendant (race, age, weight, hairstyle, style of dress) nor their combination in a single individual are unusual in the population, as were the pock marks of the short Hispanic woman. Many young African Americans wear their hair in dreadlocks and wear hoodies. Interestingly, the arrest report for defendant shows that he, too, had acne, but there was no similar notation for the carjacker.

The court in *Jernigan* also had before it statistics to show a Hispanic female was "a most unlikely bank robber." (*Jernigan*, *supra*, 492 F.3d at p. 1055.) In our case we have been presented with no statistics to suggest that young African American men, with or without dreadlocks, are underrepresented in committing the types of crime involved here. Therefore, *Jernigan* is not persuasive.

As the prosecutor told the trial court, "If the defense is allowed to bring in every male black with dreadlocks in Fairfield who committed crimes similar to this, robberies with guns and carjackings, we could just open up the flood gates." The trial court did not abuse its discretion in refusing to open those flood gates.

**Strength of the evidence as affecting admissibility of third party culpability evidence**

Defendant contends the prosecution's case was weak and that factor should have influenced the court's ruling on admissibility of evidence of third party culpability. He argues the prosecution's evidence was so weak that additional evidence of the April 11 carjacking would have been sufficient to raise a reasonable doubt as to defendant's guilt. In particular, defendant argues "[t]he evidence linking defendant to the crime was unreliable cross-racial identification of him made under highly suggestive conditions," and "[t]here was none of the corroborating evidence one would expect to find if defendant was actually the robber." Defendant also argues the gun found under the ice machine did not match the victims' descriptions of the gun used in the robbery, there was no evidence defendant's female companion was Gross, there was no evidence defendant

handed anything to his female companion, there was no evidence Gross put a gun under the ice machine, and there was no evidence linking the gun to either defendant or Gross.[8]

But the evidence pointing to defendant's guilt was much stronger than he acknowledges. Defendant wore the same clothes as the robber. Both Hernandez and Shishido firmly identified defendant near the scene within minutes of the robbery and were equally certain at trial.

Defendant asks us to discount the identification evidence because the identifications were cross-racial.[9] The jury was instructed under CALCRIM No. 315 that, in evaluating identification testimony, it should take into account whether the witness and the defendant are of different races. Given the victims' certainty of the identification, the close proximity in time between the show up and the crime, and the court's admonition to the jury, defendant's complaint about cross-racial identification carries little weight. Cross-racial or not, these two independent identifications of defendant were strong evidence of his guilt.

The rest of the evidentiary gaps cited by defendant could be filled by inference from the evidence presented. Officer Kresha told Officer High defendant had been in the company of a woman just prior to his arrest. Officer High went to Travis Lodge, not far from the crime scene, specifically because he recognized defendant from a previous encounter there. He evidently went there on the hunch he might find the woman who had accompanied defendant on the prior occasion. He learned from the front desk clerk that Gross had come in earlier and passed through the vending machine area. He personally contacted Gross in the hotel's stairwell and would have known whether she was the same woman who had been with defendant on the prior occasion. That she was the same woman may be inferred from all the testimony.

---

[8] Gross initially told the police the gun was hers. She later told them it was defendant's gun and he had used it in both the Hernandez-Shishiido robbery and the New Year's Day robbery.

[9] Defendant's unopposed motion for judicial notice of the ethnic backgrounds of the victims was granted on March 28, 2013.

Similarly, when Officer High found the gun under the ice machine, it was reasonable to infer Gross had abandoned it there. It was also fair to infer she had obtained it from defendant after the robberies. The jury was instructed in accordance with CALCRIM No. 223 that both direct and circumstantial evidence are acceptable forms of proof.

Defendant also exaggerates the supposed contradictions in identifying the gun as the one used in the robberies. Hernandez testified the gun resembled the one used in the robbery. Shishido also testified it could have been the same gun, although he was not sure. Neither Hernandez nor Shishido was familiar with guns, and their testimony about the gun was not altogether consistent. While Shishido thought the gun was silver or shiny, Hernandez testified it was black. The gun, in fact, is predominantly black with some silver showing, which may explain the discrepancies in the two descriptions.

That Hernandez's wallet and Shishido's ten dollar bill were never recovered did not significantly undercut the prosecution's case. Defendant could have secreted the items somewhere, given them to Gross, or handed them to the man he and Gross were seen talking to in a car.

Finally, defendant points out he was "behaving in a very unusual manner for a person who has just robbed two men at gunpoint . . . ." Defendant claims if he "had actually been the man who robbed Mr. Hernandez a few minutes earlier," he would have run away rather than lingering near the apartment complex.

But an armed assailant who successfully robbed two unarmed individuals would not necessarily expect the victims to follow him. It would not be unbelievable for defendant to rendezvous with his girlfriend before leaving the area, which is precisely what occurred. Although defendant lingered several minutes, he was in the process of leaving when Hernandez arrived and spotted him. And even if defendant's behavior was unusual, it could as easily be a testament to his brazen lawlessness as to his innocence. While flight is often evidence of a guilty conscience, failure to flee is not necessarily indicative of innocence. (*People v. Williams* (1997) 55 Cal.App.4th 648, 651-653.) The jury was aware of the facts and could draw or refuse to draw available inferences.

Add to that defendant's refusal to participate in a lineup, and the evidence of guilt was strong. Truly, the most "unusual" behavior by defendant, as compared with that of an innocent man, was his refusal to participate in a lineup that was scheduled at the request of his attorney. Obviously, the lineup could have exonerated him if he were truly innocent of the offense. His refusal to participate suggests a guilty conscience and leads us to conclude the evidence of a carjacker with dreadlocks was not likely to have raised a reasonable doubt about his guilt.

## DISPOSITION

The judgment is affirmed.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Haerle, J.